2005 VT 110

# William Monahan and Lisa Monahan v. GMAC Mortgage Corporation, Allstate Insurance Company and The Holden Agency, Inc.

[893 A.2d 298]

No. 03-508

Present: Dooley, Johnson and Skoglund, JJ., and Howard, Supr. J. and Allen, C.J. (Ret.), Specially Assigned

Opinion Filed September 16, 2005
Motion for Reargument Denied November 16, 2005

*Allan R. Keyes* and *R. Joseph O'Rourke* of *Ryan Smith & Carbine, Ltd.*, Rutland, for Plaintiffs-Appellees.

*Andre D. Bouffard* of *Downs Rachlin Martin PLLC*, Burlington, for Defendant-Appellant GMAC Mortgage Corp.

¶ 1. **Johnson, J.** Defendant GMAC Mortgage Corporation (GMAC) appeals from the superior court's denial of its renewed motion for a judgment as a matter of law following a jury verdict awarding plaintiffs compensatory, consequential, and punitive damages for their claims of breach of escrow and breach of the implied covenant of good faith and fair dealing. GMAC asserts that the court erred by failing to set aside the verdict on the implied covenant count, and the punitive damages award, because plaintiffs' evidence was legally insufficient to justify submission of these issues to the jury. As part of its argument, GMAC asserts that the claim for breach of the implied covenant of good faith

170

and fair dealing should have been analyzed under the standard for bad faith handling of a first-party insurance claim. We reject GMAC's general sufficiency argument on the good-faith-and-fair-dealing claim because we conclude that, although the evidence supported competing inferences, a reasonable jury was entitled to draw those inferences in favor of plaintiffs. We also decline GMAC's invitation to analyze the case as a first-party bad-faith insurance claim because, due to GMAC's breach of contract, plaintiffs did not enjoy a first-party insurance relationship with the insurer involved here. Accordingly, we affirm the jury's verdict on the good-faith-and-fair-dealing count, and the award of compensatory and consequential damages. GMAC also challenges the sufficiency of plaintiffs' evidence to support the punitive damages award. We vacate the punitive damages award because none of the evidence of GMAC's direct conduct and the conduct of other entities attributable to it demonstrate actual malice sufficient to support plaintiffs' claim for punitive damages. GMAC also appeals the decision to award plaintiffs attorney's fees. We reverse and remand for recalculation of the fee award.

¶ 2. On appeal from the denial of a motion for judgment as a matter of law under Vermont Rule of Civil Procedure 50(b), we must review all the evidence in the light most favorable to the nonmoving party, excluding the effect of any modifying evidence. *Gero v. J.W.J. Realty*, 171 Vt. 57, 59, 757 A.2d 475, 476 (2000). Modifying evidence is that evidence which the jury is free to disbelieve because of questions about its credibility. 9A C. Wright and A. Miller, Federal Practice and Procedure § 2527, at 282-88 (2d ed. 1995). When, as here, the defendant challenges the sufficiency of plaintiff's evidence, we must determine whether the plaintiff has produced evidence that fairly and reasonably supports all elements of the disputed claims. *Id.*; V.R.C.P. 50(a). Where the evidence supports multiple reasonable inferences, we leave it for the jury to choose among them.

¶ 3. To carry their burden for the good-faith-and-fair-dealing count, plaintiffs were required to produce evidence that could lead a reasonable jury to conclude that, in attempting to remedy its clear breach of contract, GMAC also breached an implied-in-law promise not to do anything to undermine or destroy plaintiffs' rights to receive the benefit of the parties' escrow agreement. See *Carmichael v. Adirondack Bottled Gas Corp.*, 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993) (explaining the purpose of the implied covenant of good faith and fair dealing). Plaintiffs could have met this burden with evidence showing

that GMAC's conduct in settling its clear breach of the escrow contract violated community standards of decency, fairness or reasonableness, demonstrated an undue lack of diligence, or took advantage of plaintiffs' necessitous circumstances. *Id.* at 209, 635 A.2d at 1216-17.

¶ 4. To support the award of punitive damages, plaintiffs needed to show that GMAC's breach of the contract, or the covenant of good faith implied in the contract, demonstrated actual malice. *Murphy v. Stowe Club Highlands*, 171 Vt. 144, 155, 761 A.2d 688, 696 (2000). Actual malice may be shown by "conduct manifesting personal ill will, evidencing insult or oppression, or showing a reckless or wanton disregard of plaintiff's rights." *Id.* With the foregoing procedural and substantive standards of review in mind, we recount the evidence in the record.

¶ 5. In September 1997, plaintiffs William and Lisa Monahan purchased a residential property in Pittsford. They chose GMAC as the mortgage lender. Prior to the closing, a GMAC representative at the Rutland branch discussed various requirements of the mortgage with plaintiffs. Because the property was located in a flood zone, plaintiffs were required to purchase flood insurance, and to bring proof of this insurance and all other required coverage to the closing. Plaintiffs procured the necessary insurance, including flood insurance, from Allstate. Plaintiffs brought an insurance binder, prepared by their insurance agent, to the closing as proof that they had satisfied their obligation to insure the property against flood damage.

¶ 6. GMAC assumed responsibility, through an escrow agreement, for ensuring that all of plaintiffs' insurance premiums and tax bills were timely paid and renewed. GMAC established an escrow account into which plaintiffs were required to make monthly payments for this purpose. GMAC was to use the escrow funds to pay the premiums when they came due. Over the first three years of the mortgage, plaintiffs faithfully made all of their escrow payments.

¶ 7. Initially, plaintiffs lived in the home along with tenants in the second floor unit. Some time prior to December 2000, plaintiffs moved into another home nearby and used the first home exclusively as a rental property. In December 2000, both rental units were occupied by tenants. Plaintiffs depended on the rental income to make the mortgage payments.

¶ 8. On December 17, 2000, a nearby stream overflowed, causing extensive flooding at plaintiffs' rental property. William Monahan testified that there was between seven and eight feet of water in the basement when he arrived at the property on the day of the flood. At

this height, the water reached the support beams below the first floor. The fire department responded and assisted in the process of pumping the water out of the basement, which took until the next day. As a result of damage done to the electrical and heating systems, the fire department ordered the tenants to vacate the premises until the electrical issues were resolved.

¶ 9. William Monahan promptly called Allstate, the flood insurance carrier, to report the loss. On December 20, Allstate representatives informed plaintiffs that they no longer had flood coverage from Allstate because the 1997 policy plaintiffs purchased for the closing had expired at the end of its term in 1998, and no renewal had been secured by GMAC. The evidence shows that plaintiffs had remitted sufficient escrow funds to GMAC for the cost of the flood insurance premiums.

¶ 10. As a result of data entry errors by personnel in GMAC's branch office, no one who monitored the escrow accounts at GMAC was alerted to the fact that plaintiffs' account should have had flood coverage, and that the coverage had expired due to nonpayment by GMAC. Due to the data entry error and certain incorrect address information on the insurance binder, which branch employees failed to notice and correct, GMAC neither received the renewal notices from Allstate, nor realized that it should have been expecting them for plaintiffs' account. An internal GMAC company email sent on January 23 acknowledges that GMAC's branch employees were responsible for these errors.

¶ 11. After learning about the lack of insurance, plaintiffs also called Voice of the Customer (VOC), the call center that handled customer contacts for GMAC. Plaintiffs notified GMAC that the rental property had flooded and that Allstate had disclaimed coverage. Apparently, Julie Goodwin of GMAC's vendor management group in Waterloo, Iowa, began addressing the situation. On December 20, unbeknownst to plaintiffs, Goodwin contacted Wilshire National Company (WNC), the claims administrator for a blanket insurance policy held by GMAC, for the purpose of protecting its interest in mortgaged properties. An email sent by Goodwin to a WNC representative on December 21 recognizes that there should have been coverage and that "this customer currently doesn't have flood insurance and we need to provide him the coverage and submit his claim to be paid." In response to GMAC's inquiry, WNC sent GMAC a "reservation of rights" letter on December 22, 2000. WNC also sent plaintiffs a copy of this letter. The letter stated, in part, that

> On behalf of [GMAC's] insurer, we acknowledge our obligation to thoroughly investigate [GMAC's] loss to determine whether there may exist facts that will allow coverage to be afforded under the terms of the master policy. We are unable to make a decision whether to accept or reject [GMAC's] claim until we have completed our investigation.

The letter also indicated that WNC would be sending an adjuster from VALCO-USA to investigate the claim. WNC ultimately confirmed that GMAC's blanket policy, which was issued to GMAC by Lloyd's of London, would be used to cover plaintiffs' loss. GMAC and WNC failed to timely communicate this decision directly to plaintiffs.

¶ 12. Unlike the Allstate policy originally purchased by plaintiffs that named plaintiffs and GMAC as insureds, the blanket policy named GMAC as the only insured. Typically, GMAC invoked the protection of this blanket policy in situations where its mortgage customers, unlike plaintiffs in this case, had failed to secure or maintain proper insurance.

¶ 13. According to his testimony, William Monahan spoke to GMAC's Goodwin on the morning of December 21, and she asked him to call back later in the afternoon around 1:30 p.m. When he called GMAC's office at that time, he reached an answering machine with the recorded message that GMAC's offices would be closed as of 11:30 a.m. for the Christmas holiday. Neither Goodwin, nor any other GMAC representative, returned Monahan's call.

¶ 14. On January 3, 2001, Christopher Place, an insurance adjuster selected by WNC, arrived at plaintiffs' rental property to assess the damage. Two days later he created a flood report for WNC, erroneously determining based on the watermark left in the basement where the water eventually settled, that the flood water had reached a height of only four and one-half feet, well below the level William Monahan had observed on the day of the flood. Place estimated the actual cash value of plaintiffs' loss at $4,706.54, less the $1,000 deductible. Place's internal report indicates that plaintiffs were very distressed because of the extent of the damage and the loss of the rental income, and as a result were in need of a quick settlement.

¶ 15. Plaintiffs did not hear anything further from GMAC or WNC until January 24 when Place sent a letter offering to settle the loss for $3,706.54 based on his report, which had been redated to indicate that it was prepared on the same day as the letter. Upon receipt of this offer, plaintiffs sought an independent estimate from Timothy

Raymond, a local contractor with twenty-seven years of relevant experience in repairing similar damage.

¶ 16. William Monahan escorted Raymond through the home to survey the damage. On January 27, Raymond estimated that he would require $50,695.90 to repair the damage from the flood. His estimate was based on the conclusion that all of the electrical wires in the house would have to be replaced, regardless of whether they were physically touched by the flood waters. Plaintiffs offered testimony from other experts who supported Raymond's conclusion that all the electrical wiring was compromised. Raymond explained that most of the walls, carpets, and major fixtures would have to be torn out so that the old wiring would be accessible for removal, and that once torn out, these items would need to be replaced with new materials. Raymond testified that if GMAC had timely paid on the loss consistent with his estimate, he could have completed all repairs indicated by April 1, 2001.

¶ 17. After receiving Raymond's significantly higher estimate, plaintiffs replied to WNC's $3,706.54 offer in a February 7, 2001 letter sent by their attorney. Plaintiffs advised that they were unwilling to accept the lower offer. Plaintiffs also notified Place that they began losing rent on December 17 as a result of the flood, and that the loss of approximately $1200 per month would continue until the repair work was completed. The letter makes clear that the amount plaintiffs would claim as loss under the policy would be directly related to the delay in resolving their claim. The letter closed with plaintiffs requesting a prompt response as to Place's intentions.

¶ 18. Twenty days later, WNC responded to plaintiffs' letter. The letter, addressed to plaintiffs' attorney, clearly identified GMAC as the insured under the policy, while the Monahans were referenced only as "your client." A copy of GMAC's insurance policy and another copy of Place's report and estimates accompanied the letter. In the text of the letter, WNC's representative, Ofelia Chuate, called special attention to those parts of the policy that WNC relied on as justifying Place's more conservative estimate, including the limitation that the insurance covered only "[d]irect physical loss by or from flood," and that loss of rents was specifically excluded from coverage under the policy.

¶ 19. The evidence shows that the Allstate policy would have provided similar coverage, but for GMAC's failure to renew it in breach of the escrow contract. Both policies covered only direct physical loss from the flood, which each policy defined in nearly identical terms. The Allstate policy, like the blanket policy, also had an exclusion for increased costs of repair resulting from compliance with an "ordi-

nance" regulating construction or repair, but did not specifically exclude lost income from rents. Losses resulting from interruption of "business, profession, or manufacture" or "any other economic loss" were excluded, however.

¶ 20. On March 3, 2001, plaintiffs' attorney called WNC's Chuate to discuss her letter. Apparently, the conversation focused on the differences between the costs Raymond estimated and the costs that Place identified as covered under the insurance policy. WNC maintained that the approximately fifty-thousand dollars worth of work Raymond's estimate covered would have resulted in a significant upgrade to the electrical system that existed in the house prior to the flood. According to WNC, GMAC's blanket policy did not cover such an upgrade. Nonetheless, as a result of this conversation, WNC agreed to send Duane Fricke, yet another insurance adjuster, to inspect the property.

¶ 21. WNC received Fricke's partial adjustment on May 1, 2001. It estimated the loss at $15,000, but the accompanying letter noted that an investigation was still ongoing as to the exact extent of the covered loss. At issue was a state regulatory finding that the electrical system in the house had numerous preexisting National Electrical Code violations that needed to be addressed along with the flood repairs. Fricke subsequently amended his report, estimating the loss at approximately $7,000. Chuate testified that WNC was still unsatisfied with the estimate. WNC then turned to Charles Lane, a professional engineer, for help determining the proper allocation of repair costs between direct flood loss and what WNC considered code upgrade.

¶ 22. Meanwhile, plaintiffs' dissatisfaction with the situation had reached the point where they filed suit seeking compensatory, consequential, and punitive damages from GMAC because of its alleged breach of the escrow agreement and breach of the implied covenant of good faith and fair dealing. Plaintiffs specifically alleged that GMAC's failure to renew the Allstate policy left them uninsured, and that GMAC's failure to timely and accurately adjust and pay the loss had compounded the problem by rendering the house uninhabitable during the delayed reconstruction. At the time, almost five months had passed without any reconstruction on the property. Plaintiffs had been offered payment for the loss, but not in an amount that they believed was due to cover the loss as assessed by their local contractor. Other than the contacts mentioned above, GMAC did little to interact directly with plaintiffs. GMAC was aware of the correspondence between WNC, the

adjusters, and plaintiffs, but took no steps to intervene on plaintiffs' behalf.

¶ 23. Lane visited plaintiffs' rental property to conduct another assessment on June 25, 2001. He observed a water mark on the basement wall at a height of about 4' 6", and assumed that the water had gone no higher during the flood. In 2003, after further investigation, Lane ultimately concluded that the water had reached a height of six. feet, and therefore additional repairs to wiring on the first and second floor would be necessary. Even without accounting for those repairs, his initial report to WNC, dated June 27, 2001, estimated the total cost of repairs attributable to the flood at $6,553.00. Less the deductible, this amount was almost two thousand dollars more than WNC's offer to plaintiffs.

¶ 24. Beth Avalese at WNC received Lane's report on July 9. As with Fricke's reports, WNC officials disapproved of the first estimate and allegedly asked him to revise it so that it excluded repairs that were required to remedy code violations. WNC believed these costs were excluded by the policy. Accordingly, on August 8, Lane sent WNC a lower estimate of $3,449. WNC then sent plaintiffs' counsel a letter further explaining the basis for rejecting Raymond's estimate, and explaining WNC's position that costs attributable to mandatory code upgrades were not covered by the policy. The letter discusses the Lane estimate, which was also enclosed. GMAC's Goodwin was copied on the letter, but there is no indication that she or anyone else from GMAC attempted to discuss the situation with plaintiffs or WNC.

¶ 25. On June 20, GMAC referred plaintiffs' mortgage to a Burlington lawyer named Joshua Lobe for foreclosure. Immediately after the flood, plaintiffs stopped paying their mortgage, and thus were in default as of January 1, 2001. The note GMAC sent to Lobe began with the instruction to "[p]lease proceed with first legal, then hold pending settlement of [plaintiffs'] lawsuit [against GMAC]." Despite this note, neither GMAC, nor their foreclosure counsel, notified plaintiffs that the foreclosure would be put on hold.

¶ 26. Plaintiffs' mortgage was governed by federal Department of Housing and Urban Development (HUD) regulations. According to GMAC's May Taylor, HUD regulations require mortgage lenders to initiate foreclosure within six months of default. At trial, Taylor revealed that there are certain HUD cases where GMAC does not file a foreclosure action even after borrowers are in default for six months. Taylor also testified that she was aware that a foreclosure filing would negatively affect plaintiffs' credit score. Consistent with the original

instructions to Lobe, and after negotiation with plaintiffs' counsel, GMAC agreed to stay the foreclosure action pending resolution of plaintiffs' lawsuit against it.[1] Apparently, this did not occur until some time after Lobe filed the foreclosure action.

¶ 27. Although the house had been unoccupied since the flood, plaintiffs had continued to store things at the property, and in late June 2001, they also sought to open the pool for summer use. Electrician Larry McDuff, who had previously rigged temporary power to the house to keep the heater working in the months after the flood, returned to run power to the pool house from the temporary power line. After the pool's power supply was connected, plaintiffs went to the property to prepare the pool for use. On July 10, they went back to use the pool and discovered that the electric service was no longer running to it; the extension cord from the temporary power had been pulled and put in the house that, along with the garage, now had new locks. They also discovered foreclosure notices posted on the house and around the property by a company named LFC Nationwide. Plaintiffs subsequently learned that GMAC's foreclosure counsel had hired LFC to winterize and secure the house.

¶ 28. A clause in plaintiffs' mortgage forbids plaintiffs from allowing the property to deteriorate, and provides that GMAC may inspect the property if it is abandoned or in default. The mortgage also empowers GMAC to take reasonable steps to protect and preserve vacant or abandoned property. Sometime in April or May of 2002, plaintiffs went to the rental property where they encountered two men who claimed to have been sent by GMAC's foreclosure counsel with instructions that the house was vacant and that they should clean up and secure the property. Disturbed by their presence, William Monahan asked them to leave, and called state troopers to the scene. After their departure, plaintiffs inspected the property and found that William Monahan's rare 1968 AMX automobile had been damaged by a barrel and steel

---

[1] On appeal, GMAC has moved this Court to take judicial notice of the stipulation it reached with plaintiffs wherein it agreed to stay the foreclosure action. Trial counsel agreed that the stipulation could come into evidence at trial, but, as plaintiffs point out in their opposition to the motion on appeal, GMAC's trial counsel failed to formally enter the stipulation into evidence. The stipulation was not, therefore, available for the jury's consideration. We deny the motion, however, on grounds that it has no effect on the Court's consideration of the issues involved. William Monahan's own testimony establishes that the foreclosure action was stayed pursuant to the parties' stipulation; thus the proffered stipulation duplicates evidence that was already available to the jury on this issue.

rack that plaintiffs believe was thrown down the side of the car by the foreclosure agents.

¶ 29. The superior court held a five-day trial in June 2003. At the close of all the evidence, plaintiffs moved for a directed verdict on count one of their complaint alleging breach of the escrow agreement. The court directed verdict in plaintiffs' favor on this count after recounting evidence showing a clear breach of the escrow agreement.

¶ 30. GMAC's counsel made motions for directed verdict at the close of plaintiffs' case and again at the close of all the evidence pursuant to Rule 50(a). GMAC moved for verdict on the implied covenant of good-faith-and-fair-dealing count, and the punitive-damages count, arguing that even when viewed in the light most favorable to plaintiffs, there was insufficient evidence to submit either count to the jury. The court denied this motion, reasoning that "there's enough acts by the company and its agents to show a reckless and wanton disregard of the rights of plaintiffs from the beginning . . . even after early notice [of the flood] was given. They were completely out of the loop."

¶ 31. The court submitted counts two and three to the jury on a special verdict form. The jury found GMAC liable for breach of the implied covenant of good faith and fair dealing. The jury also answered affirmatively to the question of whether GMAC was motivated by bad faith, ill will or reckless disregard of plaintiffs' rights such that punitive damages should be awarded. The jury awarded $45,000 in punitive damages. The jury also awarded $43,380 in compensatory and consequential damages.

¶ 32. After the jury delivered its verdict, GMAC substituted counsel. New counsel filed a renewed motion for judgment as a matter of law pursuant to Rule 50(b). In denying the motion as to punitive damages, the court summarized evidence that it considered as supporting the inference that "GMAC recklessly and wantonly disregarded plaintiffs' contractual rights." The court cited evidence of GMAC's failure to timely respond to the flood report, its failure to adequately communicate with plaintiffs on the status of the insurance coverage even though GMAC knew that plaintiffs were in distress due to their ongoing loss of rental income while the house remained uninhabitable, its decision to foreclose on plaintiffs' property at a time when GMAC had not remedied its own breach of contract, and its failure to communicate that this foreclosure would be put on hold until the flood claim was resolved. The court also relied on evidence that GMAC's foreclosure agents entered upon plaintiffs' property without consent and caused damage once there, and that GMAC's insurer, acting through WNC,

failed to adjust their flood loss in a "timely and fair manner," instead minimizing the amount payable for the loss.

¶ 33. We conclude that the trial court's opinion as to the sufficiency of the evidence supports its decision to submit the good-faith-and-fair-dealing count to the jury. By contrast, the evidence of punitive damages is insufficient to satisfy the actual malice standard established in this Court's previous cases. Accordingly, we affirm in part and reverse in part.

## I.

¶ 34. In its renewed motion, and on appeal, GMAC argues that plaintiffs' evidence of the breach of the implied covenant of good faith and fair dealing should be evaluated under the standards we established in *Bushey v. Allstate Insurance Co.*, 164 Vt. 399, 670 A.2d 807 (1995). In *Bushey*, we recognized the tort of bad-faith handling of a first-party insurance claim. *Id.* at 402, 670 A.2d at 809. An insured/insurer relationship between the plaintiff and defendant is a prerequisite for this claim. *Peerless Ins. Co. v. Frederick*, 2004 VT 126, ¶ 13, 177 Vt. 441, 869 A.2d 112. Aside from the fact that plaintiffs did not plead this claim, which is narrower in scope than the contractual good-faith-and-fair-dealing claim under *Carmichael*, we decline to address GMAC's argument because plaintiffs did not enjoy an actual insured/insurer relationship with defendant or defendant's insurance company. Compare *Carmichael*, 161 Vt. at 208-09, 635 A.2d at 1216-17 (defining contractual good-faith-and-fair-dealing claims in broad, general terms), with *Bushey*, 164 Vt. at 402, 670 A.2d at 809 (describing the specific circumstances when first-party insurers will incur bad-faith tort liability).

¶ 35. GMAC's insistence that we focus narrowly on the sufficiency of plaintiffs' evidence when tested against the elements of a tort claim for first-party bad-faith insurance handling illustrates GMAC's flawed attitude toward the predicament plaintiffs were in as a result of GMAC's breach of the escrow contract. As explained in the Restatement (Second) of Contracts § 205 comment e, which we adopted in *Carmichael*, 161 Vt. at 209, 635 A.2d at 1217, the covenant of good faith extends to the "assertion, settlement, and litigation of contract claims and defenses." GMAC breached its contractual duty under the escrow agreement to maintain plaintiffs' insurance policy — the policy that named plaintiffs as first-party insureds, and that was issued by a company with which plaintiffs had affirmatively chosen to deal. Moreover, the issue of its breach was so clear-cut that the trial court

did not even consider it worthy of jury consideration. In fact, an internal email sent by GMAC's Julie Goodwin shows that GMAC knew as early as January 23, 2001 — just over one month from the flood date — that its own branch employees were responsible for the lapsed coverage. In attempting to settle this breach, GMAC was obligated to take a remedial approach consistent with the duties imposed by the implied covenant. That did not occur here.

■ ¶ 36. GMAC correctly points out that the implied covenant's main purpose is to "ensure that parties to a contract act with 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Id.* at 208, 635 A.2d at 1216 (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)). A factual question the jury was required to answer was, therefore, whether GMAC acted faithfully to that common purpose by delegating all of the work of resolving its breach to its insurance company and its adjusters. In addition, the jury needed to determine whether such delegation and all the conduct that followed was consistent with plaintiffs' justified expectations in the face of GMAC's clear breach of the escrow contract. The jury had ample evidence to reasonably answer both questions in the negative.

¶ 37. At a minimum, insureds that suffer a catastrophic loss such as the flood damage that occurred here can justifiably expect that their insurer will promptly notify them that coverage is in place. This did not occur here. After learning that the Allstate policy had lapsed due to GMAC's nonpayment, William Monahan called GMAC in an attempt to see how the problem would be addressed. He was asked to call back later in the day, and when he did the office was closed for the Christmas holiday. Plaintiffs remained without confirmation even after they received a letter from WNC on behalf of GMAC's insurer, indicating that the question of coverage remained in doubt, and that an adjuster would be coming at some unspecified time to determine the extent of coverage for the claim, if any. Plaintiffs were not even the primary recipients of the letter, which was addressed directly to GMAC, the only insured under the blanket policy.

¶ 38. Before GMAC's insurer sent plaintiffs an offer, the question of coverage had been resolved. Despite knowing this, GMAC did not bother to communicate the information to plaintiffs. Even after WNC had an estimate in hand, plaintiffs still had to wait almost three more weeks before receiving an offer consistent with the estimate — an offer that the jury ultimately found to be low.

¶ 39. GMAC further asserts that its obligation to remedy the breach was satisfied once this alternative coverage was in place because the language of plaintiffs' Allstate policy was substantially similar to GMAC's blanket policy. This facile position overlooks an important distinction between the relationship plaintiffs would have enjoyed with Allstate as first-party insureds, and the status plaintiffs had in relation to Lloyd's of London and WNC as administrators of GMAC's policy. GMAC's duty to deal with its insurance company on plaintiffs' behalf was greater than that of an ordinary tortfeasor represented by an insurance company. Unlike a liability insurance policy, the policy GMAC put in place after breaching the escrow contract was not written with third parties in mind. Plaintiffs had no contractual or preexisting business relationship with Lloyd's or WNC, and thus no leverage over those companies. Ironically, this meant that plaintiffs, acting alone, could not even hold the insurers accountable in tort for any bad-faith adjustment the insurers may have undertaken. GMAC, as "one of the largest mortgage originators and servicers in the United States,"[2] was in a better position to negotiate an agreeable adjustment from the insurer with whom they presumably transacted a significant volume of business. Notwithstanding this fact, and the fact that, as the breaching party, GMAC had heightened duties of good faith and fair dealing, GMAC remained on the sidelines as the battle of estimates raged on between plaintiffs and the insurer's representative — that representative which GMAC specifically asked to get involved.

¶ 40. GMAC made no independent attempt to discover whether plaintiffs were asserting a reasonable claim, or whether WNC was acting reasonably in providing what plaintiffs considered a "low-ball" estimate. GMAC's inaction demonstrated a choice to blindly side with WNC, even as plaintiffs' out-of-pocket repair costs mounted along with their losses in rental income. The jury was entitled to consider this "lack of diligence" as actionable bad faith. *Id.* at 209, 635 A.2d at 1217.

¶ 41. In its brief, GMAC cites our decision in *Killington, Ltd. v. Richards*, 160 Vt. 641, 643, 641 A.2d 340, 342 (1993) (mem.), for the proposition that "it is not a violation of the implied covenant of good faith for a party to withhold a payment under a contract, where the amount payable is the subject of a good faith dispute, even if the court later determines that the defendant is liable to pay more than it

---

[2] This description comes from the web site of GMAC's parent company. See GMAC Businesses at http://www.gmacfs.com/gmacbusinesses/.

offered." GMAC's statement, while accurately reflecting the holding in *Killington*, misses the point. See *id*. GMAC's bad faith results from its inaction in the face of the dispute between WNC and plaintiffs. At the time, GMAC had no idea whether WNC had good-faith reasons to offer less than what plaintiffs were entitled to under the policy. When presented with a choice between taking an adversarial posture toward its customer and taking on the role of its customer's advocate, or, at the very least, acting as an intermediary, GMAC chose to be adversarial without independently investigating the facts.

¶ 42. In January 2001, GMAC's adversarial posture was already evident in an email from Goodwin to another GMAC employee. Goodwin noted that the mortgage required plaintiffs to live in the house for one year after closing — a requirement that they had satisfied. Though her email notes that plaintiffs had not yet obtained an attorney, she is already anticipating a lawsuit. She states:

> The only thing we could request if customer sues us is proof of when rents started, if prior to 9/98 then customer did not occupy property as noted in the mortgage documents. We may want legals [sic] opinion on this account to see where we stand in the even[t] customer does sue GMAC for loss of rents since the customer advised tenants moved our [sic] etc.

¶ 43. Moreover, GMAC had yet another choice involving an independent assessment of plaintiffs' loss. GMAC could have chosen to adjust the loss itself, sparing plaintiffs the back-and-forth with WNC. GMAC could then have used whatever money it collected from WNC to recoup its loss. In case of a dispute between GMAC and plaintiffs over the extent of the covered loss, GMAC might have been able to defend itself under *Killington, Ltd.* by showing that it was independently aware of a good faith justification for offering a lower sum than plaintiffs requested. Had GMAC taken a more direct interest in the adjustment, the company might have discovered that the Place and Lane estimates upon which WNC relied were both based on a mistaken belief that the water did not rise above four and one-half feet. Lane did not discover this error until May 2003, at which time he acknowledged that wiring on the upper floors would have to be replaced, necessitating more substantial repairs. GMAC did not, however, make the choice to get directly involved in remedying its own breach, and, thus, cannot now seek refuge under *Killington, Ltd.* See *id*.

■ ¶ 44. The implied covenant of good faith and fair dealing also prohibits one party to the contract from taking advantage of the "'necessitous circumstances'" of the other. *Carmichael*, 161 Vt. at 209, 635 A.2d at 1217 (quoting Restatement (Second) of Contracts § 205 cmt. e). The evidence shows that GMAC knew, at an early stage, that plaintiffs were in financial distress due to the loss of rental income following the devastating flood. As time went on without a satisfactory settlement, plaintiffs' situation worsened to the point where they were forced to file this lawsuit. Despite its knowledge that plaintiffs were unable to make their mortgage payments without rental income from the property, and the fact that the loss of rental income was due, in part, to GMAC's own breach of contract and lack of assistance in remedying the breach, GMAC moved ahead with foreclosure proceedings against plaintiffs. In so doing, GMAC was aware that the foreclosure filing would have an adverse impact on plaintiffs' credit rating, hurting their ability to secure future loans. Plaintiffs argued, and the trial judge agreed, that testimony regarding GMAC's foreclosure action supported "an inference that the GMAC filed a foreclosure action in retaliation for plaintiffs' refusal to accept the initial low offer to settle their insurance claim." The jury was entitled to, and apparently did, consider such retaliation in the face of plaintiffs' necessitous circumstances a violation of "'community standards of decency, fairness or reasonableness.'" *Id.* (quoting Restatement (Second) of Contracts § 205 cmt. a).

¶ 45. GMAC argues that the evidence surrounding the foreclosure proceedings does not support the inference of retaliation. GMAC notes that it had the legal right to foreclose on the mortgage because plaintiffs had stopped paying the mortgage after the flood. GMAC further argues that it was compelled to file the foreclosure when it did because of HUD guidelines applicable to plaintiffs' loans. On cross-examination, however, GMAC's May Taylor conceded that there are circumstances in which GMAC could opt not to file a foreclosure even after six months of default. GMAC also claims that it always intended to hold off on prosecuting the foreclosure action, citing file notations in its record-keeping system stating that the action should be held "pending either suit resolution, or okay to proceed from GMAC legal." Notwithstanding the company's intentions at the time of the foreclosure filing, Taylor testified, consistent with plaintiffs' evidence, that there was no indication that any GMAC representative informed plaintiffs that the foreclosure action would be put on hold. In addition, some time passed before the foreclosure action was actually placed on

hold. Finally, the notations relied on are ambiguous; the jury could have concluded that they indicate GMAC's intention to use the foreclosure filing as leverage for settlement of the plaintiffs' lawsuit.

¶ 46. We note that GMAC's evidence about its intentions regarding the foreclosure comes from its own internal files and from the testimony of its employee. Discerning GMAC's true intention is a question of fact for the jury. The sparse notations in GMAC's records were inserted at a time when plaintiffs were already suing GMAC, and thus, the jury was free to view them with skepticism. In addition, Taylor, the GMAC employee who testified about GMAC's intentions, is not a disinterested witness whose testimony the jury was required to believe. See *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 33, 176 Vt. 356, 848 A.2d 310 (recognizing that the standard of review under Rule 50 requires the court to consider evidence that supports the moving party only to the extent that it is uncontradicted, unimpeached, and comes from a disinterested witness).

¶ 47. Even if we were permitted to view GMAC's evidence in the light most favorable to it, we could not say that the inference of retaliatory foreclosure is unsupported. At most we can say that GMAC's evidence supports an equally reasonable contrary inference that the foreclosure was nothing more than standard procedure in a case of mortgagor default, and was unrelated to the ongoing disagreement over settling the flood loss in the face of GMAC's breach. GMAC's competing inference cannot prevail on review by the Court because the drawing of legitimate inferences from the facts is a jury function. *Id.*; accord *Lockwood v. Lord*, 163 Vt. 210, 217, 657 A.2d 555, 560 (1994) (recognizing that when evidence is open to multiple interpretations, the court cannot substitute its judgment for that of the jury in choosing the correct interpretation); 9A C. Wright & A. Miller, *supra*, § 2528, at 294 ("[I]f the evidence reasonably might lead to either of two inferences it is for the jury to choose between them.").[3]

¶ 48. The superior court's salient observation that GMAC consistently left plaintiffs "out of the loop" also applies to plaintiffs' evidence regarding GMAC's use of foreclosure agents. The record discloses that

---

[3] These observations about competing inferences could apply to many aspects of this case. In his briefing on appeal, defense counsel has skillfully articulated a narrative that casts his client's actions in a benign light by using much of the same evidence upon which plaintiffs rely. In some instances, this narrative is more compelling than the one GMAC presented at trial. Unfortunately, this interpretation of the evidence, however artfully presented, is one the jury was entitled to, and did in fact, reject.

GMAC failed to notify plaintiffs that foreclosure agents would be going to the property. As a result of this lack of communication, tense confrontations between plaintiffs and the foreclosure agents ensued when plaintiffs found the agents on the property not knowing who they were or what legal right they had to be there. The evidence also supports an inference that, without communicating with plaintiffs, the foreclosure agents were responsible for shutting down the pool at the rental property after plaintiffs had expended time and money to prepare it for use. The agents also changed the locks, which limited plaintiffs' access to personal property still being stored at the rental property. Plaintiffs also introduced evidence that damage had been done to that same personal property at a time when the foreclosure agents had access to and had assumed responsibility for securing the rental property. The jury found this evidence persuasive and awarded damages.

¶ 49. GMAC counters that it had the legal right to employ foreclosure agents to secure plaintiffs' property after plaintiffs defaulted. Regardless of the fact that GMAC was acting within its legal rights by sending agents to monitor the property, the jury was entitled to view GMAC's failure to communicate its intention to do so as part of a pattern of bad-faith conduct. Moreover, plaintiffs' ongoing default was related to the loss of rental income during the protracted settlement of GMAC's breach. Accordingly, the jury was entitled to assess the aggressive manner in which GMAC used foreclosure agents to enforce its rights after default against community standards of fair dealing. *Carmichael*, 161 Vt. at 209, 635 A.2d at 1217. This evidence would also permit a reasonable jury to further infer that the foreclosure process was being used as leverage in securing a more favorable settlement of plaintiffs' claim against GMAC for its breach of escrow.

¶ 50. As we noted in *Carmichael*, "good faith is ordinarily a question of fact, one particularly well-suited for juries to decide." *Id.* Good faith is also a concept that varies according to the context in which it is an implied obligation. *Id.* at 208, 635 A.2d at 1216. GMAC would have us view this case in the context of an admittedly contentious, but ultimately reasonable insurance adjustment. We have rejected this limited view of the evidentiary context, concurring instead with the trial court's observation that this case is about the duty of good faith and fair dealing that GMAC owed to plaintiffs in the aftermath of its own clear breach of the escrow agreement. Plaintiffs adduced ample evidence to support reasonable inferences about a variety of bad-faith conduct undertaken by GMAC. Although the jury

was entitled to view this evidence in the light most favorable to GMAC, we are not. Accordingly, we find no error in the superior court's decision to submit plaintiffs' claim for breach of the implied covenant of good faith and fair dealing to the jury.

## II.

¶ 51. In assessing the sufficiency of plaintiffs' evidence against the standards for punitive damages in breach of contract and tort cases, we first deal with GMAC's specific claim that our consideration must be limited to evidence of conduct by GMAC and its employees. GMAC argues that it cannot be held vicariously liable for punitive damages awarded to punish the conduct of other actors and entities such as WNC because plaintiffs' evidence did not satisfy the Restatement standard for vicarious liability as discussed in *Sweet v. Roy*, 173 Vt. 418, 444-45, 801 A.2d 694, 713-14 (2002). We do not address the merits of this challenge because GMAC failed to present it to the trial court in either of its motions for directed verdict prior to the close of all the evidence. Arguments about the sufficiency of evidence when measured against specific, applicable legal standards must be made prior to the submission of the issues to the jury; additional arguments presented for the first time in renewed motions after the verdict are waived. Reporter's Notes, 1995 Amendment, V.R.C.P. 50(b) ("A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion."); 9A C. Wright & A. Miller, *supra*, § 2537, at 344-45 (collecting cases and noting that "[s]ince the post-submission motion is nothing more than a renewal of the earlier motion made at the close of the ... evidence, it cannot assert a ground that was not included in the earlier motion.").

¶ 52. In its post-verdict order, the trial court points out that GMAC did not request a specific jury finding, and none was given, as to whether the jury's punitive damages award was based on GMAC's breach of the escrow agreement[4] or GMAC's breach of the implied

---

[4] In its order on GMAC's Rule 50(b) motion, the trial court assumed that the escrow relationship between the parties created a fiduciary duty. It then analyzed the punitive damages issue by also classifying GMAC's actions in terms of a "tortious breach of its fiduciary duty." Even in those states where punitive damages are barred in almost all contract actions regardless of the tortious character of the breach, a long-standing exception for breaches of contract involving a fiduciary relationship exists. W. Dodge, *The Case for Punitive Damages in Contracts*, 48 Duke L.J. 629, 636 (1999). Nonetheless, plaintiffs first raised this argument in response to GMAC's post-judgment Rule 50 motion. The case was neither pled, nor argued to the jury, as a fiduciary-duty case.

covenant of good faith and fair dealing. As a result, we must determine whether the evidence that supports each of those claims also supports an award for punitive damages.

## A.

¶ 53. No reasonable jury could conclude that the evidence pertaining to GMAC's breach of the escrow contract satisfies the high standard for punitive damages in breach of contract cases. Punitive damages are generally not available in breach of contract actions. *Murphy v. Stowe Club Highlands*, 171 Vt. at 154-55, 761 A.2d at 696. We recognize an exception to this general rule for cases in which the breach has the character of a willful and wanton or fraudulent tort, and when the evidence indicates that the breaching party acted with actual malice. *Id.* The undisputed evidence shows that GMAC's failure to pay plaintiffs' Allstate flood insurance premiums resulted from mere oversight on the part of low-level branch employees in conducting ministerial tasks associated with the closing. Evidence that shows nothing more than an "involuntary" breach of contract, i.e., conduct that does not involve a deliberate decision by the promisor to breach, falls far short of the punitive damages standard articulated above. Dodge, *supra*, at 687.

## B.

¶ 54. We next determine whether the evidence that supports the jury's conclusion that GMAC breached its duties of good faith and fair dealing also supports a conclusion that GMAC's conduct demonstrates actual malice towards plaintiffs, justifying an award of punitive damages.[5]

---

Therefore, the trial court erred by relying on the post-judgment-fiduciary-duty theory in assessing the sufficiency of the evidence. Accordingly, we will not incorporate the fiduciary-duty analysis into our de novo review of the legal justification for the punitive damages award.

[5] In its post-verdict motion, GMAC's argument for reversal does not account for its failure to request a specific jury finding on the question of whether the punitive damages award is based on count one, the breach-of-contract claim, or count two, the breach of the covenant of good faith claim. Accordingly, GMAC dedicates substantial attention to the question of whether evidence of a violation of the covenant of good faith satisfies the requirement, in *breach of contract actions*, that a party seeking punitive damages show that the breaching party's actions are akin to a willful and wanton, or fraudulent tort. See *Murphy*, 171 Vt. at 155, 761 A.2d at 696 (noting the rule that punitive damages are generally not available in breach of contract action except where nonbreaching party

¶ 55. Because the purpose of punitive damages is to punish conduct that is "morally culpable" and "truly reprehensible," this Court has set a high bar for plaintiffs seeking such damages. See *Brueckner v. Norwich Univ.*, 169 Vt. 118, 129, 730 A.2d 1086, 1095 (1999) (demarcating the punitive damages standard) (quotations omitted). Our precedents limit the availability of punitive damages to cases where the evidence shows that "'defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime.'" *Id.* (quoting W. Keeton, et al., Prosser and Keeton on the Law of Torts § 2, at 9 (5th ed. 1984)). Accordingly, punitive damages are available only to punish and deter defendants who acted with actual malice. *Id.*

¶ 56. In Vermont, actual malice may be shown by conduct "manifesting personal ill will or carried out under circumstances evidencing insult or oppression, or even by conduct showing a reckless or wanton disregard of one's rights." *Id.* (quotations omitted). Our cases make clear, however, that intentional, wrongful, and even illegal conduct will not justify punitive damages unless the evidence supports

---

shows tort-like conduct and actual malice on the part of breaching party). GMAC assumes that the entire case is governed by the breach-of-contract standard even though plaintiffs pled two separate causes of action. Plaintiffs correctly point out that their second cause of action for the breach of the implied covenant of good faith and fair dealing is one sounding in tort. *Greene v. Stevens Gas Serv.*, 2004 VT 67, ¶ 25, 177 Vt. 90, 858 A.2d 238 (citing *Carmichael*, 161 Vt. at 208, 635 A.2d at 1216). A cause of action for breach of the covenant of good faith can arise only upon a showing that there is an underlying contractual relationship between the parties, see *id.*; *Carmichael*, 161 Vt. at 208, 635 A.2d at 1216, but breach of that underlying contract is not necessary before bringing a tort action under the covenant. See *Carmichael*, 161 Vt. at 208, 635 A.2d at 1216 (affirming jury award for breach of the implied covenant of good faith and fair dealing even though no breach of express term in the underlying contract was alleged). Accordingly, punitive damages are available in tort actions for breach of the implied covenant of good faith if, as with all other tort actions, the plaintiff can show that the defendant's conduct demonstrates actual malice.

By assessing the conduct comprising the breach of contract count separately from the conduct supporting the good-faith-and-fair-dealing tort under *Carmichael*, we make clear that we will not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when the plaintiff also pleads a breach of contract *based upon the same conduct*. See *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 90 F. Supp. 2d 401, 419 (S.D.N.Y. 2000) ("[A] claim for breach of the implied covenant will be dismissed as duplicative if the conduct allegedly violating the implied covenant is also the predicate for breach of the underlying contract."). Tort cases brought under *Carmichael* and its progeny involve breaches of implied contractual duties of good faith and fair dealing; breaches of express contractual terms sound in contract.

an inference of "bad motive" evincing a sufficient "degree of malice." *Id.* at 132, 730 A.2d at 1097 (quotations omitted); *Meadowbrook Condo. Ass'n v. S. Burlington Realty Corp.*, 152 Vt. 16, 28, 565 A.2d 238, 245 (1989) (vacating a punitive damages award even though evidence showed that the defendant willfully and wrongfully violated the Consumer Fraud Act because of "an unwillingness to make ... necessary expenditures").

¶ 57. Of all recent cases, the facts in *Brueckner* best illustrate conduct that is wrongful, but not sufficiently malicious to warrant punitive damages. In *Brueckner*, we affirmed the trial court's denial of the defendant Norwich University's post-judgment motions for judgment as a matter of law on the plaintiff's claims for damages flowing from the university's direct and vicarious liability in causing the plaintiff physical and emotional harm. 169 Vt. at 120, 730 A.2d at 1089. Nonetheless, we reversed the jury's award for punitive damages. *Id.* The plaintiff received a verdict on his claims that Norwich, the military academy he attended for only sixteen days, was vicariously liable for assault, battery, and negligent infliction of emotional distress perpetrated by a group of upperclassmen appointed by the university to orient incoming students to the rigors of the spartan student life at Norwich. The jury also found Norwich directly liable for its negligent supervision of the upperclassmen. The jury awarded compensatory and punitive damages, and the trial court refused to disturb those awards, denying Norwich's post-verdict motions for judgment as a matter of law or, in the alternative, a new trial.

¶ 58. In his short time at Norwich, the upperclassmen appointed by Norwich subjected plaintiff William Brueckner to intense physical beatings, forced calisthenics, and emotional harassment. They vandalized his room, prevented him from attending required functions, and led him to believe that his scholarship was in jeopardy. The evidence viewed in the light most favorable to Brueckner showed that the harmful activities perpetrated by the upperclassmen were "qualitatively similar" to the indoctrination and orientation tasks that Norwich had charged the upperclassmen to perform. *Id.* at 124, 730 A.2d at 1091. Accordingly, we affirmed Norwich's vicarious liability for the beatings and psychological torment that Brueckner had to endure at the hands of upperclassmen appointed by Norwich. *Id.* We also reasoned that Norwich was responsible for anticipating and regulating the excesses of its representatives in carrying out their assigned duties, and that its failure to do so supported the jury's imposition of direct liability for negligent supervision. *Id.* at 127, 730 A.2d at 1093.

¶ 59. Despite the egregious facts of the case, and the various types of wrongful conduct involved, we declined to award punitive damages against Norwich for its "'conscious choice to remain ignorant of hazing activities.'" *Id.* at 130, 730 A.2d at 1095 (quoting the plaintiff's argument). In reversing, we noted that the trial court had fairly characterized the evidence as showing Norwich's "'indifferen[ce] to the health and safety of the [students] in its custody and control.'" *Id.* at 131-32, 730 A.2d at 1096 (quoting the trial court's opinion). Nonetheless, we concluded that punitive damages could not be awarded "solely upon the basis of conduct characterized as heedless disregard of the consequences," and that the "indifference attributable to negligence is not malice." *Id.* at 132, 730 A.2d at 1097 (quotations omitted).

¶ 60. Plaintiffs' evidence that GMAC left it "out of the loop," and adopted an adversarial posture toward plaintiffs in settling the breach of the escrow contract falls below the threshold for actual malice. Viewed in the light most favorable to plaintiffs, this conduct consists mainly of inaction when it became clear that plaintiffs were having difficulty dealing with WNC — the entity to whom GMAC delegated its responsibility to settle the breach of escrow — and lack of communication with plaintiffs who were in a state of financial distress following the devastating flood. Although this conduct may be characterized as "bad faith" or "unfair dealing" for purposes of assessing the sufficiency of GMAC's response to its own contractual breach, it does not indicate the personal ill will, or evidence the bad motive associated with malice. *Id.* at 130-31, 730 A.2d at 1096. Nor can it be considered a reckless or wanton disregard of plaintiffs' rights. *Id.* at 129, 730 A.2d at 1095. Despite the inadequacies in its response, GMAC took some initial responsibility for the situation and attempted to assist plaintiffs by providing coverage under its blanket policy. As a result, plaintiffs did receive a settlement offer, albeit one that came more than a month after the flood, and one that plaintiffs considered to be low — a judgment in which the jury ultimately concurred. At most, these aspects of GMAC's conduct shows "indifference attributable to negligence." *Id.* Negligent indifference in remedying a breach of contract may be below the standard demanded by the implied covenant, but it does not rise to the level of malice. *Id.* at 132, 730 A.2d at 1097.

¶ 61. The evidence surrounding GMAC's foreclosure and use of foreclosure agents comes closer to satisfying the actual malice standard. The trial court characterized these as retaliatory actions designed to pressure a settlement at a time when plaintiffs' financial

distress was worsening. The fact remains, however, that GMAC had express contractual discretion to foreclose on the property upon plaintiffs' default, and also to authorize agents to enter upon and inspect the vacated property once plaintiffs went into default.

¶ 62. For purposes of judging conduct against the standard of good faith and fair dealing, "[i]mplied contractual obligations [of good faith and fair dealing] may coexist with express provisions which seemingly negate them where common expectations or the relationship of the parties as structured by the contract so dictate." *Wakefield v. Northern Telecom, Inc.*, 769 F.2d 109, 112 (2d Cir. 1985); see also *Carmichael*, 161 Vt. at 208, 635 A.2d at 1216 (citing *deTreville v. Outboard Marine Corp.*, 439 F.2d 1099, 1100 (4th Cir. 1971), which states that "regardless of broad unilateral termination powers, the party who terminates a contract commits an actionable wrong if the manner of termination is contrary to equity and good conscience."). Thus, as we held above, the manner in which GMAC chose to exercise its contractual rights can support the award of compensatory and consequential damages under the covenant, given that plaintiffs could reasonably expect GMAC to refrain from foreclosing prior to settling its obvious breach of escrow. See *supra*, ¶ 49.

¶ 63. Nonetheless, we have not previously held that, absent fraudulent conduct, an award of punitive damages can be based on a party's exercise of its contractual rights. We are generally hesitant to do so — especially in light of our recognition that punitive damages are intended to punish conduct that has the "character of outrage frequently associated with crime." *Brueckner*, 169 Vt. at 129, 730 A.2d at 1095 (quotations omitted). The mitigating factors surrounding the filing of the foreclosure action counsel against taking that step in this case. Although GMAC failed to timely communicate its intent to put the foreclosure on hold pending the resolution of plaintiffs' claim, it did follow through by staying the foreclosure action after negotiations with plaintiffs' counsel. Thus, to the extent that the timing and manner of GMAC's actions in enforcing its contractual right to foreclose suggests some bad motive, such conduct does not indicate a sufficient "degree of malice," *Brueckner*, 169 Vt. at 132, 730 A.2d at 1097 (quotations omitted), to justify imposition of punitive damages.

¶ 64. Similarly, the failure to communicate with plaintiffs regarding the use of foreclosure agents to monitor the property cannot support the punitive damages claim. The undisputed evidence shows that the parties' contract gave GMAC the right to use foreclosure agents to ensure that the property was not damaged during its vacancy. At the

time of foreclosure, GMAC was aware that plaintiffs resided at a different property, and that the tenants who had been living at the rental property all vacated after the flood. Thus, the condition precedent to GMAC's use of foreclosure agents had been satisfied. Although there was evidence of damage to plaintiffs' personal property that occurred around the time that foreclosure agents had also been to the property, the evidence does not support an inference that the agents intentionally and deliberately caused this damage. At most, the evidence suggests that the agents were negligent in their failure to protect plaintiffs' personal property from being damaged. Though this conduct, coupled with GMAC's failure to adequately communicate with plaintiffs, may have been wrongful, it does not support an inference of malice. See *Meadowbrook*, 152 Vt. at 18, 565 A.2d at 245 (denying punitive damages where defendant's conduct, however wrongful, was not malicious).

¶ 65. We now consider whether any aspect of WNC's conduct, for which we must hold GMAC vicariously liable, can support the punitive damages award. See *supra*, ¶ 51 (discussing GMAC's failure to preserve argument on vicarious liability). Plaintiffs focus specifically on the evidence surrounding the Charles Lane estimates, claiming that WNC perpetrated a fraud involving "concealment and nondisclosure, if not outright misrepresentation, in the presentation of evidence." As discussed above, Lane prepared two estimates: one for $3,449 and the other for $6,553. When WNC's Ofelia Chuate sent plaintiffs a letter indicating that it would not raise its initial offer of settlement, WNC did not furnish plaintiffs with Lane's original estimate, but instead included the lower, revised estimate. Chuate cited the lower Lane estimate as justifying the earlier settlement offer. On direct examination, as part of GMAC's case, Lane testified that the lower estimate reflected his opinion on the extent of losses from the flood, but did not mention the earlier estimate. Taken together, plaintiffs assert that this conduct supports an inference of fraud, or something akin to it in the use of the lower estimate by GMAC's agents.

¶ 66. Fraud and fraudulent nondisclosure are terms of art relating to conduct that differs materially from the actions taken by Lane and WNC employees in this case. Fraud involves intentional misrepresentation of existing fact "affecting the essence of the transaction, so long as the misrepresentation was false when made and known to be false by the maker, was not open to the defrauded party's knowledge, and was relied on by the defrauded party to his damage." *Silva v. Stevens*, 156 Vt. 94, 102, 589 A.2d 852, 857 (1991) (quotations

omitted). Similarly, fraudulent nondisclosure or concealment "involves concealment of facts by one with knowledge . . . and a duty to disclose, coupled with an intention to mislead or defraud." *Id.* at 103, 589 A.2d at 857. A sufficient showing of fraudulent conduct can satisfy the actual malice requirement for punitive damages, even where some elements of the fraudulent torts are not proven. *Ainsworth v. Franklin County Cheese Corp.*, 156 Vt. 325, 331-32, 592 A.2d 871, 874 (1991). Nonetheless, even viewing the evidence in the light most favorable to plaintiffs, the evidence does not support an inference that WNC's use of the lower Lane estimate was akin to fraud.

¶ 67. The key deficiency in plaintiffs' fraud theory relates to the fact that the lower estimate provided to plaintiffs shows on its face that it was revised from an estimate made at an earlier date. The third line of Lane's "Construction Cost Estimate," which was attached to the Chuate letter, reads as follows: "Date: 06/27/2001, *Revised* 08/08/01." (emphasis added). Like the original estimate, the revised estimate has fifteen line items identified as needed "Electrical System Repairs." Whereas the original estimate includes numeric entries in the labor and material fields reflecting repair costs for items 2, 4-6, 8, 9, and 14, the revised estimate omits any cost figures for these items. Instead, the text entry "Not Applicable" spans both of those fields for the items in question. Thus, not only does the estimate that plaintiffs received from WNC indicate that it was in fact revised, it also shows which line items were subject to the revision.

¶ 68. Furthermore, the revised estimate does not purport to be an estimate of the total cost for all repairs needed to bring the house back into working order. As Chuate's letter explains in express terms, the attached Lane report identified "numerous violations of the [National Electric] Code throughout the electrical system that predate the flood and are not within the basement areas subjected to flood waters." Citing a specific provision in GMAC's blanket policy, she writes that "[t]he policy does not cover loss from any increased cost of repair or reconstruction as a result of any ordinance regulating reconstruction or repair." The revised line items indicated as "Not Applicable" on the lower estimate correspond with the code violations identified in Lane's report. The second page of the report dated July 3, 2001, contains extensive discussion of the electrical code violations in numbered paragraphs outlining the work needed to remedy the violations. A comparison between the report and the revised estimate shows that the cost of repairs related to the code violations identified in the report

were also the ones indicated as "Not Applicable" and visibly omitted from the estimate's calculations.

¶ 69. Taken together, this evidence does not support an inference that WNC attempted to hide from plaintiffs the existence of another estimate or the methodology used in revising the estimate. GMAC disclosed the fact that the second Lane estimate was revised. The extent of the revisions was discernible upon a careful comparison between the repairs implicated in Lane's report and his revised estimate, especially when read in light of Chuate's letter. Perhaps WNC could have been more explicit in connecting these dots for plaintiffs and their counsel, to whom the letter was addressed, but any perceived deficiencies in its clarity are not tantamount to misrepresentation, much less fraud or fraudulent nondisclosure.

¶ 70. The fact that GMAC's counsel did not design questions to elicit testimony about the revision process from Lane on direct examination as part of GMAC's case is also of little significance. Plaintiffs have not illustrated how GMAC's questions regarding Lane's opinion about the extent of the covered repair costs and the accuracy of the lower estimate in reflecting those costs were misleading. As part of pretrial discovery, GMAC had disclosed the original estimate to plaintiffs and had provided plaintiffs with correspondence between Lane and the WNC official who requested that Lane revise his estimate. Accordingly, GMAC was aware that plaintiffs' counsel had these materials and could introduce them into evidence. In fact, plaintiffs' counsel introduced them during cross-examination of Lane, and asked him multiple questions about them. GMAC had an obligation not to mislead the jury, and the record discloses they met that obligation. Its counsel did not, however, have an obligation to make plaintiffs' case for them on the disputed issue of which costs of repair were covered under GMAC's policy. The record does not, therefore, demonstrate fraudulent conduct by GMAC at trial.

¶ 71. None of the foregoing evidence demonstrates that GMAC or its agents engaged in any acts that meet the actual malice standard established in our precedent. Thus, however wrongful some of GMAC's actions may have been when measured against its duties of good faith and fair dealing, the evidence of its wrongful actions was insufficient to support an award of punitive damages.

## III.

¶ 72. Plaintiffs have also raised, for the first time, an alleged defect in GMAC's appeal based on the untimeliness of GMAC's renewed motion

for judgment as a matter of law. The superior court's denial of a Rule 50(b) motion cannot be appealed unless the party that was denied judgment as a matter of law at the close of all the evidence renews its motion by service and filing "not later than 10 days after entry of judgment." V.R.C.P. 50(b). Pursuant to the rule "[r]enewal of the motion [for judgment as a matter of law] is *necessary* to appeal from a denial of ... a motion for a judgment as a matter of law." (Emphasis added.) Vermont Rule of Civil Procedure 6(b) limits the superior court's power to enlarge time limits under the rules by giving the superior court discretion to extend time for filing motions under Rule 50(b) "no more than 20 additional days unless the specific rule otherwise provides." V.R.C.P. 6(b). By its terms, Rule 50(b) does not provide for any additional extensions beyond the twenty days provided in Rule 6(b).

¶ 73. The court entered judgment in this case on June 10, 2003. Two days later, the court granted GMAC's first motion for an extension of time for the filing of post-trial motions. The first extension expired on and required filing by July 12, 2003. Had no extension been granted, the initial ten-day period for filing provided by Rule 50(b) would have expired on June 24, 2003.[6] Accordingly, the maximum extension permitted by the rule was to July 14 — twenty days after the expiration of the first ten-day period. Nonetheless, on July 8, 2003, GMAC moved for a second extension of time to file its motion to July 25, 2003 — eleven days beyond the maximum time the rules allow for filing of Rule 50(b) motions.

¶ 74. There is no dispute that GMAC sought and was granted two extensions of time, and that the second of those went beyond the total time period for filing provided by Rules 50(b) and 6(b). Plaintiffs did not object, however, to either extension of time in the superior court, although they have raised the issue on appeal. In fact, GMAC's second motion for the challenged extension expressly states that plaintiffs' counsel consented to the motion. Plaintiffs' failure to object in the trial court effects a waiver on appeal. See *Maguire v. Gorruso*, 174 Vt. 1, 9, 800 A.2d 1085, 1092 (2002) (ruling that claim not raised in trial court was waived on appeal).

---

[6] Because the Rule 50(b) time period is less than 11 days, V.R.C.P. 6(a) requires that the due date for the motion be computed by excluding the day judgment was entered, as well as Saturdays and Sundays. Therefore, the due date was more than ten calendar days from the entry of judgment.

### IV.

¶ 75. GMAC also appeals the trial court's award of $85,686.75 in prejudgment and post-judgment attorney's fees to plaintiffs. GMAC concedes that a portion of this award is supported by the fee provision in the home loan escrow statute, 8 V.S.A. § 10404(h). GMAC takes issue, however, with the part of the fee award that the court based on the jury's finding that its conduct was "motivated by bad, ill will or reckless disregard of the Monahans' rights." GMAC notes that the trial court made no indication that the fee award was premised on litigation-related bad faith or abuse of the judicial process, and made no findings that any such conduct occurred. Instead, GMAC asserts that the trial court grounded much of the fee award on "the same business activity that was the basis for GMAC[]'s substantive liability." The court has discretion in assessing the facts of each case to determine whether the case is among those exceptional ones where attorney's fees, beyond those provided for by statute or contract, are warranted. The court abused this discretion, however, in awarding plaintiffs attorney's fees based solely on the same bad-faith conduct for which the jury awarded compensatory and consequential damages.

¶ 76. Absent a statutory or contractual provision, we apply the "American Rule" that requires parties to bear their own attorney's fees. *DJ Painting, Inc. v. Baraw Enters.*, 172 Vt. 239, 246, 776 A.2d 413, 419 (2001). We have recognized that courts may invoke their equity powers to deviate from this rule, but "'only in exceptional cases and for dominating reasons of justice.'" *Id.* (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 167 (1939)). A close examination of those cases in which we have approved of fees awarded pursuant to this exception — the same cases principally relied on by the trial court in its order — reveals important distinctions with the present case.

¶ 77. *In re Gadhue* is a seminal case in which we applied the exception to compensate the plaintiff for attorney's fees she incurred prosecuting a second lawsuit against a defendant whose actions had "prolonged the litigation by denying plaintiff the fruits of her initial victory." 149 Vt. 322, 329, 544 A.2d 1151, 1155 (1987). We summarized the facts in *Gadhue*, and those in a similar New Hampshire case cited therein, as representing situations where a "litigant was compelled to appear twice before the state supreme court in order to obtain relief which should have been forthcoming after the first appearance." *Id.* at 328, 544 A.2d at 1154. The exception recognized in *Gadhue* took form during the second round of litigation only, and did not apply to fees

incurred during the first full round of litigation stemming from defendant's initial misconduct. *Id.* at 329, 544 A.2d at 1155.

¶ 78. Our decision in *Winey v. Cutler*, 165 Vt. 566, 678 A.2d 1261 (1996) (mem.), fits within the narrow limits of the exception delineated in *Gadhue*. There, the plaintiff was forced to file a second lawsuit and appeal before receiving satisfaction on a judgment that should have been forthcoming after this Court affirmed the jury award in her initial action. The plaintiff brought the second lawsuit as trustee process against the sole-proprietorship corporation that employed the judgment debtor. We noted that the judgment debtor in Winey's first lawsuit had refused to pay the judgment despite owning substantial assets that were more than sufficient to satisfy the judgment that he sheltered from the plaintiff's reach. In the second action, the debtor used his management powers in his closely-held corporation to manipulate payroll in an attempt to frustrate the plaintiff's attempt to garnish his wages. Under these circumstances, equity demanded that the defendant pay all the fees and costs for the superfluous litigation necessitated by his obstinate refusal to pay the original judgment. *Id.* at 568, 678 A.2d at 1263.

¶ 79. Accordingly, in *DJ Painting, Inc. v. Baraw Enterprises*, we reversed an award of attorney's fees based on the plaintiff's "bad faith" in filing suit against defendants despite a contract clause requiring the plaintiff to settle disputes through arbitration. 172 Vt. at 246, 776 A.2d at 419. In refusing to deviate from the American Rule, we explained that the defendants were not forced into "multiple trips through the state court system," and that there was no indication that the plaintiff had acted obstinately or obdurately in conducting the litigation. *Id.* at 247, 776 A.2d at 420. Although we agreed with the trial court's assessment that a reasonable reading of the arbitration clause could have foreclosed the plaintiff's lawsuit, we could not find "dominating reasons of justice" for awarding attorney's fees to the defendants. *Id.*

¶ 80. Similarly, *Cameron v. Burke*, 153 Vt. 565, 572 A.2d 1361 (1990), provides no support for plaintiffs' claim that the exception to the American Rule is not limited to cases involving litigation misconduct. There, we did not apply the *Gadhue* exception at all, but instead affirmed an award based on Vermont Rule of Civil Procedure 11. *Id.* at 576, 572 A.2d at 1367 ("In the instant matter, we need not address the issue of whether *In re Gadhue* can apply in nonequity cases, since, under V.R.C.P. 11, a court may impose reasonable attorney's fees on a party who makes averments in . . . motions, or other papers merely to harass or cause unnecessary delay."). Moreover, although the award in

*Cameron* was grounded on a rule-based fee provision, the rule relied on is one that specifically proscribes litigation misconduct. See V.R.C.P. 11(b) (requiring attorneys to affirm that representations contained in written court filings are sufficiently supported and are not made for improper purposes).

¶ 81. In reliance on federal precedent purportedly applying Vermont law, plaintiffs assert that attorney's fees can be awarded where there is a showing of bad-faith insurance denial. The principal case cited by plaintiffs, *Burlington Drug Co. v. Royal Globe Insurance Co.*, 616 F. Supp. 481, 483 (D. Vt. 1985), recognizes that other jurisdictions have carved out an exception to the American Rule, and will award attorney's fees in cases where a bad-faith insurance denial is shown, but that the status of the rule in Vermont is unclear. More recently, we intimated, in dicta, that bad-faith insurance denial might satisfy the "demanding" standard for departure from the American Rule, but ultimately declined to award fees because no bad faith or other outrageous conduct on the part of the insurer had been shown. *Concord Gen. Mut. Ins. Co. v. Woods*, 2003 VT 33, ¶ 18, 175 Vt. 212, 824 A.2d 572. We will not rule on the issue here. As plaintiffs emphasized in a different part of their brief, arguing against imposition of the *Bushey v. Allstate* standard, "[t]his was not a case about breach of an insurance contract. GMAC Mortgage is not an insurance company."

¶ 82. Plaintiffs' rights have been sufficiently vindicated in the first, and thus far only, legal action against GMAC relating to the present dispute. Although they have introduced sufficient evidence to support the jury's verdict on their claim of breach of the implied covenant of good faith and fair dealing, plaintiffs have not shown, nor has the trial court found, any bad faith or outrageous conduct by GMAC or its counsel in defending against plaintiffs' claims. GMAC's liability for breaching the escrow statute was the only clear-cut issue in this case, and to the extent that plaintiffs incurred attorney's fees in proving that breach, the statute provides for their reimbursement. Therefore, the trial court abused its discretion by awarding attorney's fees to plaintiffs without identifying any litigation-related bad faith or delay sufficient to justify an award under the exception to the American Rule we adopted in *Gadhue*.

¶ 83. Notwithstanding this error, plaintiffs claim that we can affirm the full fee award without requiring a remand, citing our holding in *L'Esperance v. Benware*, 2003 VT 43, ¶ 24, 175 Vt. 292, 830 A.2d 675. In *L'Esperance*, we affirmed a trial court's award of attorney's fees under the Consumer Fraud Act even though the award covered work that

counsel performed on other claims not arising from the statute. *Id.* ¶ 24. In so doing, we accepted the trial court's finding that the claims arose from a "common core of facts" because evidence relevant to the nonstatutory claims was also relevant to the issue of exemplary damages under the statute. *Id.* Plaintiffs allege a common core of facts here in proving liability and damages on both the statutory and nonstatutory counts. In the instant case, however, the trial court expressly declined to make a finding on the common-core-of-facts issue, relying instead on its view that GMAC's bad faith in breaching the implied covenant justified the fee award. Moreover, as we noted in our discussion on punitive damages, *supra,* ¶ 54 n.5, the conduct that establishes the breach of contract is largely distinct from GMAC's conduct in breaching the implied covenant. Ultimately, however, determining the appropriate amount of billable hours allocable to each of plaintiffs' claims is a question of fact for the trial court. On remand, therefore, the trial court shall recalculate the fee award to reflect work spent proving GMAC's breach of the escrow agreement and the damages flowing therefrom.

*The award of compensatory and consequential damages is affirmed. The award of punitive damages is vacated. The award of attorney's fees is reversed and remanded.*