**KILLINGTON, LTD. v. Stuart L. RICHARDS and The Pinnacle Association**

[641 A.2d 340]

No. 91-607

July 26, 1993. Plaintiff appeals an order of the Rutland Superior Court, granting it judgment for $248,356, plus interest and costs, under an agreement to treat and dispose of sewage for defendant's condominium project. Plaintiff also appeals the court's order denying plaintiff the right to rescind the agreement. We affirm.

In 1981, plaintiff sold defendant's assignor, a real estate developer, 10

acres of land on which he built a condominium complex. As part of the agreement, plaintiff agreed to treat and dispose of the sewage from the condominiums and thus was able to obtain a higher price for the land. The agreement also obligated defendant to pay plaintiff a proportionate share of the "cost of operation" of the sewage treatment plant and the sewage system, and included a termination provision in the event defendant failed or refused to comply with its terms.

Plaintiff subsequently entered into agreements with other condominium developments to process their sewage, requiring the construction of a second treatment facility, which went on line in 1984. Late that year plaintiff began to include both depreciation and interest on the funds borrowed for its new treatment facility as part of the "cost of operation" under its agreement with defendant. Defendant objected to what it viewed as overcharges and declined to pay the full amount of the bills. Plaintiff brought the present action, claiming, inter alia, that defendant had failed to pay amounts due, and that it was entitled to rescind the agreement for breach of contract.

The trial court found that plaintiff improperly billed defendant for depreciation and interest, but that all other charges it included as "costs of operation" were reasonable. The court found depreciation and interest to be capital costs and not within the meaning of the "cost of operation" contemplated by the parties. The court reasoned that depreciation is "an accounting device which allocates the capital cost of a fixed asset over its estimated useful life," "not hav[ing] anything to do with money paid out . . . to operate the sewage system." Likewise, the court found

that "interest paid on funds borrowed to construct the new sewage treatment plant and the extensive additions to the collection system made in 1984" were also capital costs.

Under this interpretation of the agreement, plaintiff had overcharged, but defendant had underpaid. The court concluded that defendant owed an additional $248,356 in payments and interest, rather than the $557,864.87 plaintiff sought. It denied rescission of the agreement.

At issue is whether the trial court erred in construing the term "cost of operation." Plaintiff contends only that the court erred by failing to consider local custom and usage of the trade to assist in its construction of this term of the agreement. We disagree. First, plaintiff had the burden of demonstrating the existence of such "usage of the trade." See *Russell's Executrix v. Ferguson,* 77 Vt. 433, 436, 60 A. 802, 802 (1905). Plaintiff's purported proof was evidence showing that certain municipal contracts in Rutland defined operating costs as including depreciation and interest. This did not establish any custom and usage as to the meaning of "cost of operation," but only that the agreements offered had specifically defined the term to include these items. Further, there is no evidence whatsoever that the parties had any such custom of the trade in mind when negotiating and concluding the agreement in question. See *E.L. Stoddard & Son v. Village of North Troy,* 102 Vt. 462, 469, 150 A. 148, 151 (1930).

Second, even if Killington had been able to demonstrate the existence of a trade usage, it is relevant only when the terms of an agreement are ambiguous. *Linsley v. Lovely,* 26 Vt. 123, 136 (1853); *Heaton v. Boulders Properties, Inc.,* 566 A.2d 1127,

1130–31 (N.H. 1989) (specific terms in brokerage agreement prevail over alleged custom of informality). Killington has not argued that the terms of the agreement in this case were ambiguous or that reference to "usage of the trade" was required to understand the intent of the parties. Cf. *Hazen First State Bank v. Speight,* 888 F.2d 574, 578 (8th Cir. 1989) (usage in conflict with express terms of subrogation agreement would be disregarded); *Chas. H. Tompkins Co. v. Lumbermens Mut. Cas. Co.,* 732 F. Supp. 1368, 1374 (E.D. Va. 1990) (express terms of surety agreement prevail over proffered usage of trade). Therefore, the court was entitled to interpret the agreement without reference to local custom and usage of the trade, even if one were established.

In interpreting the agreement, which did not define cost of operation to include depreciation and interest, the court found that the purchase price of the land and the sewage covenant by plaintiff were closely linked and that plaintiff's sewage undertaking increased the price. The court could logically conclude that the parties intended plaintiff to recover the capital costs of the system attributable to defendant's development through the sale of the land and defendant to pay for the ongoing costs of operating the system. In any event, the burden was on plaintiff, as drafter of the agreement, to spell out the elements it intended to be encompassed in the "cost of operation" in the agreement. "[A] doubtful provision in a written instrument is construed against the party responsible for drafting it." *Toys, Inc. v. F.M. Burlington Co.,* 155 Vt. 44, 49, 582 A.2d 123, 126 (1990); see *Trustees of Net Realty Holding Trust v. AVCO Financial Services,* 147 Vt. 472, 475–76, 520 A.2d 981, 983 (1986). Its failure to define the term defeats its claim here.

Plaintiff also argues that the court erred in failing to enforce the termination provision of the agreement, which gave plaintiff the right to terminate it if defendant "failed and refused" to comply with its terms. Plaintiff argues that defendant admitted nonpayment in its answer, concluding the question in plaintiff's favor and terminating the agreement automatically. We disagree. What was required of defendant was to perform its duties under the agreement in good faith, and no more. See *Seward Yacht Sales, Ltd. v. Murray Chris-Craft Cruisers, Inc.,* 701 F. Supp. 766, 722 (D. Or. 1988) (manufacturer did not exercise bad faith in terminating dealership, given at-will agreement and dealer's performance); *Security Bank & Trust Co. v. Beaufort,* 540 A.2d 13, 15 (R.I. 1988) (bank acted within its discretion in refusing further advances under loan agreement in light of other encumbrances); *Badgett v. Security State Bank,* 807 P.2d 356, 360 (Wash. 1991) (no breach of contract when party simply stands on rights to require performance of contract in accordance with its terms). The court specifically found that the defendant acted in good faith, concluding that defendant "had very good reasons for refusing to pay." Upon review, we find that conclusion to be supported by the record. The fact that defendant paid less on its account than the court later determined was due falls far short of demonstrating bad faith in compliance with the agreement because the amount of compensation due plaintiff was disputed. As there was no bad faith failure or refusal to comply with the agreement's terms on the part of defendant, there was no basis for the plaintiff to terminate the agreement. We therefore affirm

the court's refusal to enforce the clause on that ground.*

*Affirmed.*

---

* Plaintiff also sought enforcement of the termination clause on the ground that defendant breached the agreement by utilizing capacities in excess of specific allocated flows. The court found no basis for terminating on the claimed ground of excess usage and dismissed that claim as being without merit. We agree.