## Southface Condominium Owners Association, Inc. and Kenneth David Burrows v. Southface Condominium Association, Inc., A. Judson Babcock, and Chittenden Realty Credit Corporation and Chittenden Trust Company d/b/a Chittenden Bank

[733 A.2d 55]

No. 97-374

Present: Amestoy, C.J., Morse, Johnson and Skoglund, JJ., and Norton, Supr. J., Specially Assigned

Opinion Filed May 14, 1999

*J. Scott Cameron* and *Bernard D. Lambek* of *Paterson & Walke, P.C.*, Montpelier, for Plaintiffs-Appellees.

*Andre D. Bouffard* and *Eric A. Poehlmann* of *Downs Rachlin & Martin PLLC*, Burlington, for Defendants-Appellants.

*Cynthia L. Amara* and *Loretta Smith*, New England Legal Foundation, Boston, Massachusetts, for Amicus Curiae Vermont Bankers Association, Inc.

**Morse, J.** Defendants Chittenden Realty Credit Corporation (CRCC) and Chittenden Trust Company (CTC)[1] appeal following a jury verdict in favor of plaintiffs, Southface Condominium Owners Association and Kenneth Burrows, on a claim that defendants breached an implied covenant of good faith and fair dealing with plaintiffs. Challenging the exclusion of certain evidence under V.R.E. 403, plaintiffs cross-appeal from the jury's verdict for defendants on plaintiffs' claim that CRCC established a joint venture with Southface Condominium Associates (SCA) and was thus equally liable with SCA. We reverse on both issues and remand for a new trial on plaintiffs' joint-venture claim.

This action arises out of a proposed maintenance building that was never constructed at Southface Condominiums. Southface consists of forty residential units located at the base of the Sugarbush ski area in Warren, Vermont. The project was developed by SCA whose sole shareholder and president was defendant Babcock.[2] The project was financed by CRCC pursuant to a loan agreement reached in 1983 between CRCC and SCA.

The terms of the loan designated SCA as the "Borrower" and CRCC as the "Lender." Provisions in the loan agreement included the interest rate on the loaned money, payment terms, security for the

---

[1] CTC was a sister corporation to CRCC, with both entities being wholly-owned subsidiaries of Chittenden Corporation. In March 1986, CRCC assigned all of its rights in the SCA loan agreement to CTC, also referred to as Chittenden Bank.

[2] Both SCA and Babcock were named as defendants in the superior court but did not appear at trial and are not parties to this appeal. SCA filed for Chapter 7 bankruptcy and is now a defunct corporation.

loan and action to be taken in the event of default. The loan contained an "initial loan" of $50,000, the purpose of which was to fund Babcock's initial investment in SCA. The loan also contained a "construction loan" in an amount sufficient to allow SCA to purchase the land on which the project was to be built and to fund the construction of the condominiums.

The loan called for CRCC to be repaid as the individual condominium units were sold. CRCC held the mortgage. When a unit was sold, CRCC was to receive the money from the sales to repay its loan to SCA, and in return, CRCC would release its mortgage interest in that unit. The loan was to be paid back according to the following terms:

> [The money received from the unit sales] shall be applied first to the payment of any unpaid charges, then to interest and then to the unpaid principal amount of the Loan, until the Construction Loan and all interest and all charges related thereto are paid in full and the Initial Loan has an unpaid principal balance of $50,000.

Following the execution of the loan agreement, Babcock, acting as the agent for SCA, signed a unilateral declaration of condominium for the Southface project. The declaration described the property, the condominiums, permitted uses, and extended certain rights to SCA and the individual unit owners. Article IV of the declaration contained the following language: "Phase II (if added) shall also include a *management building* to be constructed on Phase I property, and to include office and storage space and one dwelling unit." (Emphasis added.) Neither CRCC nor CTC were mentioned in the declaration; however, CRCC executed a "Consent to Declaration of Condominium" on February 21, 1984, which provided that CRCC "[s]pecifically consented to . . . the condominiumization . . . in accordance with the terms of a Declaration of Condominium." The construction of condominium units twenty-one to forty of Phase II was completed, but the management building was never built. The failure to construct the building prompted this suit.

## I.

The first issue we address is whether the trial court erred in submitting to the jury plaintiffs' claim that CRCC breached an implied covenant of good faith and fair dealing to them as third-party beneficiaries. Plaintiffs contend that CRCC breached the implied covenant in the loan and the declaration by failing to ensure that

sufficient funds were either budgeted or set aside to construct the building.

Defendants attack the breach of good faith claim on several fronts. First, defendants claim that that theory was not raised in the pleadings, nor was it tried by the express or implied agreement of the parties. Second, they argue that the trial court erred in determining that plaintiffs could be third-party beneficiaries of the construction loan contract between CRCC and SCA. Finally, defendants contend that even if the jury could find that plaintiffs were third-party beneficiaries, the evidence was insufficient to support a breach of the covenant of good faith with SCA.

Plaintiffs contended that CRCC acted in bad faith by using the money from the sale of the last two condominiums to pay down the loans instead of using it to construct the building. We conclude that the evidence did not support the verdict for unfair dealing. We therefore need not address whether the owners were third-party beneficiaries or if the claim was properly raised in the pleadings.

■ In *Carmichael v. Adirondack Bottled Gas Corp. of Vermont*, we defined the implied covenant of good faith and fair dealing broadly. Each party to a contract makes the implied promise that each will not do anything "to undermine or destroy the other's rights to receive the benefits of the agreement." 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993). The purpose of the implied covenant of good faith and fair dealing is to ensure that parties act with "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Id.* (citation omitted). Conduct involving "bad faith" is characterized as violating "community standards of decency, fairness or reasonableness." *Id.* at 208-09, 635 A.2d at 1216 (citation omitted). We address the construction loan contract and the declaration of condominium separately.

Regarding the construction loan, the factual question is whether CRCC adhered to the agreed common purpose of the contract consistent with the justified expectations of SCA, the other party to the construction loan contract. The loan agreement between CRCC and SCA called for CRCC to be repaid from monies received through the sale of the condominium units. There was nothing unusual about this type of repayment plan. CRCC was to release its mortgage interest on the units as it received the proceeds from the sale of the units. As long as a loan balance was outstanding, SCA had corresponding monthly interest payments due on the money it borrowed from CRCC. Furthermore, SCA's ability to repay its loan to CRCC

was directly related to its ability to sell the individual units. The units sold well early, but sales slowed dramatically towards the end of the project. The inability to sell the remaining few units in a timely manner caused SCA to carry its debt with CRCC longer than anticipated, and the interest payments tied to this debt caused SCA to run out of money before the project was completed. In fact, with the sale of the last condominium, SCA owed CRCC over $90,000. At that point, SCA was unable to borrow more funds under the existing loan agreement because of the outstanding debt to CRCC. Thus, the maintenance building was not built.

The loan agreement is devoid of any language to support plaintiffs' claim that CRCC owed a duty to plaintiffs to ensure that sufficient funds were either budgeted or set aside for the construction of the building. As noted earlier, the loan called for repayment of funds in the following order: 1) unpaid charges related to the loan; 2) interest due on the loan; and 3) unpaid principal amount, until the construction loan, all interest, and all charges applicable thereto, were paid in full and the initial loan had an unpaid principal balance of $50,000. SCA followed this repayment order. No evidence was introduced at trial of any wrongdoing that resulted in plaintiffs' damages. Bad faith cannot be inferred from the expected course of business. See *Killington, Ltd. v. Richards*, 160 Vt. 641, 643, 641 A.2d 340, 342 (1993) (mem.) (citing *Badgett v. Security State Bank*, 807 P.2d 356, 360 (Wash. 1991) (finding no breach of contract when party simply requires performance of contract in accordance with agreement's terms)). If bad faith infiltrated the transaction, it must appear that SCA and CRCC acted beyond merely observing the terms of the loan agreement.

Plaintiffs' argument that CRCC acted in bad faith hinges on language extracted from paragraph 9(b) of the loan; "[a]ny outstanding [p]roject bills shall be paid, or *appropriate reserves established*, prior to calculating the additional interest due Lender." (Emphasis added.) We are unpersuaded that "appropriate reserves established" could translate into a requirement under the loan agreement that CRCC ensure that sufficient funds were reserved to construct the management building.

SCA, as project developer, was responsible for the construction of all facets of the project, including the management building. Unanticipated circumstances surrounding the project during its latter stages resulted in SCA's inability to sell the remaining units. SCA needed the money from these final sales to construct the building. That money didn't materialize in time, and CRCC simply followed the

repayment terms of the loan agreement by using the money to pay down its loans.

We next address the declaration of condominium. Defendants contend that they were not a party to the declaration and therefore are not bound by the obligations entered into unilaterally by SCA with the future owners of Southface condominiums. Even if defendants were determined to be parties to the declaration of condominium, there is no evidence of bad faith to support plaintiffs' claim of a breach of the implied covenant of good faith and fair dealing. While the declaration of condominium unequivocally states the intent to construct a management building as part of Phase II, it is silent on the method of payment for construction. Nowhere could it be implied from the language of the declaration that CRCC was responsible for ensuring funds were available.

■ The trial court erred by denying defendants' renewed motion for a judgment as a matter of law on plaintiffs' implied covenant of good faith and fair dealing claim. Viewing the evidence in the light most favorable to plaintiffs as the nonmoving party, we find the record lacking any evidence indicating defendants took action contrary to their agreement with SCA. See *Haynes v. Golub Corp.*, 166 Vt. 228, 233, 692 A.2d 377, 380 (1997) (review of Rule 50 motions asks whether the result reached is sound in law on the evidence produced).

## II.

We next address plaintiffs' cross-appeal. Plaintiffs contend that CRCC entered into a joint venture with SCA to develop the project, and that CRCC was equally liable with SCA and Babcock on the terms of the declaration of condominium. Plaintiffs' claim hinges on the promise to build the management building specified in the declaration. If SCA and CRCC were joint-venturers, CRCC would be liable for failing to fulfill SCA's promise in the declaration to construct the building for plaintiffs.

Evidence admitted at trial supporting plaintiffs' joint-venture claim included provisions in the loan agreement that allowed CRCC to share in profits from the sale of condominium units and extra payments to CRCC, above the interest earned on the construction loan, which could equal forty to fifty percent of the net sales price of the units. CRCC also retained the right to: disapprove of the sales price for each unit, approve the general contractor for the project, receive copies of the construction plans and contract from which SCA

could not materially deviate without CRCC's permission, and erect a sign on the premises advertising its financial involvement and soliciting mortgage business from prospective buyers. The jury found that CRCC's relationship with SCA was that of "lender-borrower" and returned a verdict for CRCC on the joint-venture claim.

Plaintiffs contend that the trial court abused its discretion in excluding evidence related to the joint-venture claim under V.R.E. 403 (permitting exclusion of otherwise relevant evidence if probative value substantially outweighed by unfair prejudice, confusion, or waste of time). The court excluded evidence that CRCC admitted that it was not a licensed lender and evidence that CRCC violated provisions of Vermont's licensed lender statute. See 8 V.S.A. §§ 2201-2235 (requiring licenses for loan businesses and limiting interest rates lenders may charge), amended by 1995, No. 162 (Adj. Sess.), §§ 1-36. Plaintiffs sought to introduce evidence to show that CRCC never obtained a license and failed to adhere to the statutory provisions limiting interest rates for licensed lenders.

While the court found the evidence "slightly" probative of whether CRCC had entered into a joint venture with SCA and relevant to that fact, the court excluded it under V.R.E. 403. The court was primarily concerned with the "cry to passion" that could prejudice the jury against CRCC because it had violated the licensed lender laws. The court also noted the dangers of "distraction and consumption of time," but ultimately excluded evidence of CRCC's noncompliance with the licensed lender provisions because the potential for "hostility" toward CRCC substantially outweighed any probative value on the joint-venture issue.

Trial courts have broad discretion in ruling on the relevance and admissibility of evidence, reversible only for abuse of that discretion. See *Haynes*, 166 Vt. at 236, 692 A.2d at 382. We find reversible error here.

■ Evidence that CRCC loaned money to SCA to finance the condominium project without complying with Vermont's licensed lender statute was more than "slightly" probative of whether a joint venture existed between the parties to the loan agreement. How CRCC conducted its loan business in the context of Vermont's statutory regulations bore directly on plaintiffs' claim that this was not merely a "lender-borrower" arrangement, but that CRCC had instead entered into a joint venture with SCA to build the condominiums. Moreover, any danger that the jury might have interpreted a statutory violation too broadly and harbored prejudice against CRCC

could have been addressed with appropriate limiting instructions. See *Haynes*, 166 Vt. at 236, 692 A.2d at 382 (noting that limiting instruction may reduce risk of juror misuse of evidence). CRCC's failure to comply with Vermont's licensed lender statute supplemented the evidence that was admitted and served to rebut CRCC's assertion that they were a mere lender in the deal. It was error to prevent the evidence from reaching the jury.

Plaintiffs also maintain that the trial court erred by excluding documents that predated the loan agreement between CRCC and SCA. These documents, identified as plaintiffs' exhibits numbered 2, 5, 6, & 7, related to negotiations conducted between Babcock and CRCC in anticipation of the 1983 loan agreement, which explicitly used the term "joint-venture." The executed agreement had deleted "joint-venture" and instead described the deal as a "loan."

Exhibit 2 was a letter from Babcock to Charles Black, president of CRCC, in which Babcock "propose[d] a joint-venture with [Black's] bank for the development of the [project site] on the Sugarbush Access Road." Exhibit 5 was a memorandum on CTC letterhead outlining a "general partnership" between CRCC and Babcock "for the purpose of constructing a forty unit condominium development in Warren, Vermont." Exhibit 5 also indicated that CTC would "get title to the land and ownership of two model units." Exhibit 6 was an option to purchase development rights for the "Southface Condominium Project," signed only by Babcock, which denoted both Babcock and CRCC together as "buyers." The final exhibit, 7, was the second page of another letter from Babcock to Black stating that Babcock was "particularly pleased to know that the Chittenden had chosen [SCA] as its first joint-venture partner." The first page of this letter was not produced in discovery and is presumed missing. The court excluded these exhibits under V.R.E. 403 because it found that their probative value on the joint-venture claim was substantially outweighed by the potential for confusing the jury and wasting court time. We disagree.

Exhibit 2 was found to have "minimal relevance" since it was written to CRCC's president almost a year before the agreement was signed, and the court excluded it because "it's going to need to have an explanation which is going to be wasting court time." Exhibit 5 was excluded because of "needless consumption of time" even though plaintiffs' counsel sought to introduce it to show the jury the "true nature of the [1983] agreement" and that every element discussed in exhibit 5 was eventually embodied in the final agreement. Exhibit 6

was also excluded because of "confusion to the jury, [and] time consumption in order to have this explained and dealt with." The court found that these considerations substantially outweighed exhibit 6's relevance because the document was signed only by Babcock and raised "side issues" that would waste court time. Finally, the court excluded exhibit 7 based on a "403 ruling" and reasoned only that the first page of the letter was missing, and that "we assume it's to Mr. Black . . . because I see his name at the top of the page, along with a date."

These documents were more than marginally relevant to the issue of whether or not a joint venture existed between SCA and CRCC, particularly because they provided tenor and context to the agreement that eventually arose, and were further evidence of a joint-venture arrangement. See *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 139, 636 A.2d 744, 751 (1993) (elements of joint venture include agreement to share in profits and losses, joint control or right to control, a joint proprietary interest in subject matter, and community of interest in performance of common purpose).

■ We recognize that trial courts are vested with broad discretion when ruling on evidence and that a showing of abuse is a stringent test. See *Quirion v. Forcier*, 161 Vt. 15, 21, 632 A.2d 365, 369 (1993) (burden of showing abuse discretion is heavy one). While the trial court understated the relevance of the document evidence, it overstated the potential problems of confusion and waste of time. The excluded exhibits were directly related to negotiations that culminated in the 1983 agreement and would not have raised a side issue that would have led the jury away from the subject matter of the dispute. Cf. *In re Letourneau*, 168 Vt. 539, 554, 726 A.2d 31, 41 (1998) (no error to exclude marginally relevant evidence that threatened to create a side show of unrelated issues). The court could have qualified its concerns with the documents with limiting instructions to guide the jury to consider them in the proper context. We find that it was an abuse of discretion to exclude plaintiffs' exhibits numbered 2, 5, 6, & 7.

■ Defendants urge that the court should have excluded the documents as inadmissible parol evidence. We disagree. That rule "bars the admission of evidence of a prior or contemporaneous oral agreement that varies or contradicts the terms of a written agreement." *Housing Vermont v. Goldsmith & Morris*, 165 Vt. 428, 431, 685 A.2d 1086, 1088 (1996). Without addressing the trial court's

ruling, we note that plaintiffs did not offer these documents to alter the terms of the 1983 agreement. Rather, plaintiffs offered them to provide the jury with evidence concerning the nature of the contract, and to assist it in determining whether the agreement was a strict lender-borrower deal or a joint venture. See *New England Educ. Training Serv., Inc. v. Silver Street Partnership*, 156 Vt. 604, 610, 595 A.2d 1341, 1344 (1991) (noting evidence to ascertain true character of mortgage agreement rather than to vary terms not barred by parol evidence rule). Thus, the documents were not rendered inadmissible by the parol evidence rule.

Accordingly, we reverse and remand solely on the issue of liability on plaintiffs' joint-venture claim. Plaintiffs' claim regarding CRCC's alleged breach of the implied covenant of good faith and fair dealing is not revived by virtue of our remand of the joint-venture claim. Because we have determined that the evidence does not support a breach of that duty even if CRCC were bound to the terms of the declaration of condominium, plaintiffs' good faith and fair dealing claim is dismissed. Damages need not be retried because the award reflecting the total cost of constructing the management building has been determined and no issue on damages was raised in this appeal.

*Reversed and remanded.*