NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 38

Nos. 2019-096 & 2019-205

| | |
|---|---|
| Construction Drilling, Inc. | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Civil Division |
| | |
| Engineers Construction, Inc. | December Term, 2019 |

Helen M. Toor, J.

Erin Miller Heins of Langrock Sperry & Wool, LLP, Burlington, for Plaintiff-Appellant/
  Cross-Appellee.

Darren R. Misenko of Misenko Construction Law, Waterbury Center, and William Alexander
  Fead of Fead Construction Law, PLC, Burlington, for Defendant-Appellee/Cross-Appellant.


PRESENT: Reiber, C.J., Robinson, Eaton and Carroll, JJ., and Morris, Supr. J. (Ret.),
        Specially Assigned


¶ 1. **EATON, J.** Subcontractor Construction Drilling, Inc. (CDI) appeals from the trial court's judgment on the merits in its breach-of-contract claim against Engineers Construction, Inc. (ECI). CDI contends that the trial court erred in: (1) holding that the terms of the parties' subcontract required CDI to request a change order before it billed ECI for "drilling in obstructions" in excess of CDI's bid price; (2) denying CDI's motions to reopen the evidence and for a new trial; and (3) awarding ECI $234,320 in attorneys' fees under the Prompt Payment Act. ECI cross-appeals, arguing that the trial court improperly allowed CDI's owner to offer opinion testimony absent a finding of reliability under Vermont Rule of Evidence 702 and maintaining that

his testimony could not have met this standard in any event. Therefore, should this Court reverse the trial court's denial of CDI's breach-of-contract claim, ECI asserts that the matter must be remanded for a new trial without such testimony. We affirm, and therefore do not reach the issue raised in ECI's cross-appeal.

¶ 2.     Following a five-day bench trial, the court made the following factual findings by a preponderance of the evidence. ECI obtained the contract for a railroad-bridge reconstruction project planned by the town of Hartford. The contract called for twenty-eight underground structural supports, known as "micropiles," to be installed in locations designated by the town's engineering firm. ECI entered a subcontract with CDI pursuant to which CDI—which had expertise in this area, having previously installed between 100 and 200 micropiles—was to complete that portion of the work.

¶ 3.     Micropiles are drilled using hollow metal tubes, known as "casings," which attach one atop the other. The bottommost casing is fitted with a drill bit. As the bit spins into the ground, the drill rig forces liquid down the center of the casings. This liquid pushes underground material up the space surrounding the casings and out of the borehole. When the drill reaches design depth, grout and rebar are installed through the center of the casings. Some of the casings are removed, while others are left underground in order to strengthen the piles. Finally, a concrete slab is placed atop the piles to distribute the load—in this case, the weight of the trains crossing the bridge.

¶ 4.     The subcontract between the parties set a flat price for CDI's work, but included a clause providing that, if CDI was "drilling in obstructions" which necessitated CDI spending more than four hours to complete drilling the hole, the price would be adjusted by payment of $920.00 per rig hour and the cost of drill bits. A separate provision stated that CDI could request a change order adding or deducting costs "when changes in the work are encountered or expected." The subcontract also incorporated by reference the specifications, schedule, and general conditions in

2

ECI's contract with the town. As trains were to continue running during construction, the project involved "[a] lot of planning and work with the railroad . . . to minimize conflicts."

¶ 5.    CDI began drilling the first pile, designated as NC-8, on August 28, 2013. The following day, the NC-8 borehole reached design depth. The driller then temporarily stopped work on NC-8 in order to assist a colleague installing grout in a different pile. When the driller returned to work on NC-8, the drill became stuck. For weeks, CDI endeavored without success to free the casing. It used various means to do so, including drilling a narrower "side hole" in hopes of loosening the stuck casing.

¶ 6.    However, at no point did CDI advise ECI that it considered the underlying issue to be "drilling through obstructions," a circumstance which would trigger the added-cost provision of the subcontract. As a result, while ECI was aware that the casing was stuck, its general superintendent did not believe that CDI's attempts to free the equipment would result in additional costs to ECI. Had the superintendent known that CDI would seek to bill ECI for its efforts pursuant to the added-cost provision, he would have issued a "stop work" order. Rather than struggling to finish NC-8, it would have been possible to drill a new pile; this would have cost approximately $9600.

¶ 7.    Nineteen days later, the casing was finally removed when a jack was brought to the site to apply 150,000 pounds of pressure. ECI only learned of CDI's belief that efforts to free the casing constituted "drilling in obstructions" when CDI subsequently billed ECI for $120,000 in additional charges for its efforts to free the casing. ECI denied the claim, and CDI sued for breach of the subcontract on this basis.[1]

---

[1]  Below, CDI also argued breach of the subcontract relative to ECI's refusal to pay bills for excess grout and train delays. The trial court ruled in favor of CDI on the former issue, and in favor of ECI on the latter. Neither party challenges these rulings on appeal. However, the dissent points out that because the excess-grout claim was subject to the same additional-items provision governing the drilling-in-obstructions claim, the trial court's holdings on these two points are inconsistent. Post, ¶ 37. We agree—had the excess-grout ruling been appealed, we would find it

3

¶ 8. At trial, the parties presented differing theories as to the cause of the stuck casing. ECI argued that CDI left NC-8 without drill liquid circulating through it for too long, causing the hole to collapse around the casing and create "side friction" which prevented its removal, and that this circumstance did not represent "drilling in obstructions" within the meaning of the subcontract. CDI contended that the polymer used in the drilling liquid would have kept the hole from collapsing regardless of whether the liquid was being run through it while the drill rig was shut down. It argued that either the teeth of the drill bit had become stuck in a boulder, or, after drilling stopped, boulders shifted underground, trapping the bit and casing, both circumstances which constituted "drilling in obstructions."

¶ 9. In its subsequent ruling on the merits, the trial court found that the more likely cause of the stuck casing was a boulder or boulders shifting into the space around the casing after drilling had finished, as CDI had argued. Therefore, it concluded, CDI's efforts to free its equipment constituted "drilling in obstructions" within the meaning of the added-items clause. However, the court held that ECI's failure to pay these added costs was not a breach of the subcontract because such obstruction drilling was a change in the work, and CDI was therefore required to request a change order in the manner specified by the subcontract before billing for the added work. Finally, the court held that ECI was the "substantially prevailing party" under Vermont's Prompt Pay Act, a conclusion which entitled the contractor to recovery of its "reasonable attorney's fees" and expenses. 9 V.S.A. § 4007(c).

¶ 10. After the court issued its ruling on the merits, but before judgment was entered, CDI filed a motion to reopen the evidence. It sought to offer the testimony of CDI's project foreman, whom they were previously unable to locate. CDI proffered that the foreman would

in error. However, because ECI did not appeal the excess-grout ruling, and because we affirm the trial court's decision, but not the analysis which led it to that decision, this inconsistency is irrelevant.

testify to "conversations that he had on-site with ECI employees, including statements to those employees that the work being done was ECI's responsibility and [ECI] would be billed," and indicated that the foreman could provide an evidentiary foundation for his records related to the project. CDI's owner averred that he lost contact with the foreman after the foreman was involved in a car accident on his way home from the Hartford project site, and detailed subsequent fruitless efforts to contact him, including: numerous telephone calls and detailed voicemails explaining the need for his testimony; inquiries made of his friends; and driving to his last known address, where CDI's owner knocked on multiple entry doors, called the foreman's phone again to see if it would ring inside the house, peered through the windows in search of evidence that the foreman lived there, and ultimately taped a note to the door.

¶ 11. The trial court denied the motion, finding that the owner's affidavit did not reflect that the foreman's whereabouts could not have been discerned prior to trial through the exercise of due diligence. Further, it held that CDI failed to show that the newly-discovered evidence was likely to change the outcome of the case; indeed, the court had concluded in its merits ruling that CDI was required to submit a request for a change order "through formal channels, not informal notice to someone on the job site." Following entry of judgment, CDI moved for a new trial on identical grounds, or, in the alternative, requested that the court reconsider its ruling on the motion to reopen the evidence. Although CDI proffered additional affidavits in connection with this second motion, the court denied it on the same bases. Finally, the court ordered CDI to pay ECI a total of $234,320 in attorneys' fees, plus costs, pursuant to the Prompt Pay Act. This appeal followed.

## I. CDI's Breach-of-Contract Claim

¶ 12. The trial court's factual findings will be upheld unless they are clearly erroneous. Sweet v. St. Pierre, 2018 VT 122, ¶ 10, 209 Vt. 1, 201 A.3d 978. However, the question of whether a contract is ambiguous is a legal one, subject to de novo review. John A. Russell Corp. v. Bohlig,

5

170 Vt. 12, 16, 739 A.2d 1212, 1216 (1999); see also In re Affidavit of Probable Cause, 2019 VT 43, ¶ 3, __ Vt. __, 215 A.3d 694 (describing de novo review as "nondeferential and plenary"). "If the court concludes the writing is unambiguous, it must declare the interpretation as a matter of law"; if it reaches the opposite conclusion, interpretation of the ambiguous contract becomes a question of fact. John A. Russell Corp., 170 Vt. at 16, 739 A.2d at 1216.

¶ 13.    Here, the trial court drew no explicit legal conclusion as to whether the subcontract was ambiguous. For its part, CDI argues that the subcontract unambiguously permitted CDI to bill for drilling in obstructions without submitting a request for a change order to ECI. ECI counters that the subcontract is ambiguous as to whether drilling in obstructions constituted a "change in the work" triggering the change-order requirement, and that principles of interpretation applicable to ambiguous contracts support the trial court's conclusion that the change-order requirement encompassed claims for drilling in obstructions. Although we part ways with the trial court's analysis, we affirm its holding that CDI was required to submit a change-order request if it wished to bill ECI for drilling in obstructions.[2]  See Gilwee v. Town of Barre, 138 Vt. 109, 111, 412 A.2d 300, 301 (1980) (observing that we may affirm a decision where "the record . . . indicates any legal ground for justifying the result," because "[a] trial court can achieve the right result for the wrong reason").

¶ 14.    The mere "fact that a dispute has arisen as to proper interpretation does not automatically render [contract] language ambiguous." Isbrandtsen v. N. Branch Corp., 150 Vt.

_____

[2] We cannot agree with the dissent's characterization of our analysis as an adoption of "the trial court's faulty reasoning." Post, ¶ 38. At its inception, our analysis fundamentally diverges from that employed by the trial court: While we find the contract language unambiguous, the trial court's reliance on tools of construction suggests that it reached the opposite conclusion. See Kipp v. Estate of Chips, 169 Vt. 102, 107, 732 A.2d 127, 131 (1999) (holding that where contract language is unambiguous, "the court must accept the plain meaning of the language and not look to construction aids"). Moreover, while the trial court found that the ECI-town contract incorporation clause was "unclear," and did not rely on it in reaching its legal conclusion, we hold that the incorporation clause is fundamental to our understanding of the contract's plain language.

575, 581, 556 A.2d 81, 85 (1988). Rather, "[i]f a contract, though inartfully worded or clumsily arranged, fairly admits of but one interpretation, it may not be said to be ambiguous or fatally unclear." Id. at 580-81, 556 A.2d at 85 (quotation omitted). To determine whether a contract "fairly admits of but one interpretation," the "agreement must be viewed in its entirety, with an eye toward giving effect to all material parts in order to form a harmonious whole." Id. at 580, 556 A.2d at 85; see also In re Grievance of Verderber, 173 Vt. 612, 615, 795 A.2d 1157, 1162 (2002) (mem.) ("[W]hen the language of the contract is clear on its face, we will assume that the intent of the parties is embedded in its terms. We must, however, give effect to every part of the instrument and form a harmonious whole from the parts." (citation omitted)); John A. Russell Corp., 170 Vt. at 17, 739 A.2d at 1216-17 ("To determine the meaning of a specific provision of a contract, we consider the whole instrument and construe it in harmony if possible."). In thus seeking to harmonize contractual provisions, we may "read terms into a contract" only where "they arise by necessary implication." In re Stacy, 138 Vt. 68, 71, 411 A.2d 1359, 1361 (1980); see also Downtown Barre Dev. v. C & S Wholesale Grocers, Inc., 2004 VT 47, ¶ 9, 177 Vt. 70, 857 A.2d 263 (explaining that courts may insert terms into a contract by implication only where "the implication arises from the language employed or is indispensable to effectuate the intention of the parties" and that "[v]aguely implied conditions may not be inserted . . . particularly when those conditions are inconsistent with the express language of the agreement").

¶ 15. Because we must view the subcontract in its entirety, with an eye to harmonizing each of its material parts, we begin by identifying those portions germane to this dispute. See Isbrandtsen, 150 Vt. at 580, 556 A.2d at 85; Verderber, 173 Vt. at 615, 795 A.2d at 1162. Two documents, ECI's subcontractor agreement and CDI's bid proposal, form the basic framework of the subcontract. Both reflect that the bid proposal "is included in and forms an integral part" of the subcontractor agreement, taking "precedence over any other terms and conditions of such Subcontract." The subcontractor agreement, in turn, provides that "ECI's Contract with [the town

7

of Hartford] is incorporated into this Agreement by reference and becomes part of this Agreement. The Subcontractor agrees to accept the specifications, schedule, and general conditions in ECI's Contract with [the town of Hartford], except for exclusions in the Subcontractors proposal accepted by ECI."

¶ 16.  The trial court observed in dicta that the incorporation provision was "unclear," noting that "ECI rests some of its legal arguments on terms in the contract with the town that it says apply to CDI, but the court is at a loss to understand how obligations ECI had to the town can become obligations of CDI to ECI merely by saying the spec[ifications], schedule[,] and conditions are incorporated in the subcontract."  However, this Court finds the import of the incorporation clause straightforward, in light of a fourth material provision of this subcontract—and, indeed, all contracts.

¶ 17.  "An underlying principle implied in every contract is that each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement." Carmichael v. Adirondack Bottled Gas Corp. of Vt., 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993).  This "implied covenant of good faith and fair dealing exists to ensure that parties to a contract act with 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' "  Id. (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)).  Thus, "[e]ach party to a contract makes the implied promise that each will not do anything to undermine or destroy the other's rights to receive the benefits of the agreement."  Southface Condo. Owner's Ass'n v. Southface Condo. Ass'n, 169 Vt. 243, 246, 733 A.2d 55, 58 (1999) (quotation omitted).  The court was correct in noting that ECI's obligations to the town did not become CDI's obligations to ECI by virtue of this provision.  However, in incorporating by reference its contract with the town, ECI made explicit to CDI both the common purpose underlying the subcontract and the benefits ECI expected to receive through the subcontract.  CDI therefore impliedly agreed to do nothing to undermine ECI's thus-identified rights under the town

8

contract.[3] See id. In short, the incorporation clause put CDI on notice that the CDI-ECI contract should be interpreted with fidelity to the management structure of the project as a whole. With this understanding of the relevant contractual provisions, we turn to the question of what is required of the parties under each section, and then consider whether those requirements may be read to create a harmonious whole. See Isbrandtsen, 150 Vt. at 580, 556 A.2d at 85.

¶ 18. CDI's bid proposal provides a flat price of $266,600 for the work agreed to under the subcontract. This cost is itemized to include a single mobilization of drilling equipment, "1700 LF @ $128.00/LF," and "Pile Load Test One (1) Each." The proposal further notes that the price is based on a forty-hour work week and "drill holes for pile installation" of five-eighths inch diameter. At issue here, however, is the provision stating that "the price quoted shall be adjusted during the course of the work by payment of the following additional items." These "additional items" include "payment of $920.00 per rig hour, excluding cost of bits (bit consumption will be calculated at cost plus 10%) for drilling in obstructions such as but not limited to steel, timbers, old foundations and boulders that requires more than 4 hours to complete drilling the hole." The bid proposal does not dictate a mechanism through which such adjustments are to be made. However, the subcontract—through ECI's subcontractor agreement—provides that

> [a] request for a Change Order may be submitted by the Subcontractor when changes in the work are encountered or expected. The request shall include documentation on the change, add or deduct costs, and possible changes to the schedule. No work shall proceed on a Change Order until approved in writing by ECI.

CDI urges us to conclude that the "additional items" clause provides "that if CDI was drilling in obstructions, including boulders, and it took more than four hours to complete drilling the hole, then CDI was entitled to payment of $920 per rig hour," and no notice to ECI was required. It

---

[3] Indeed, the trial court ruled that CDI was not entitled to additional payment under the subcontract for delays caused by train traffic during work hours, see supra, note 1, because "[i]t was clear from the subcontract that the work had to be done around the train schedules, since the contract with the town was incorporated into the subcontract."

further argues that because the bid proposal contemplated the possibility that CDI would encounter subsurface obstructions necessitating more than four hours to complete drilling each hole, and set a price which would apply in this circumstance, drilling in an obstruction was not a "change in the work" triggering ECI's change-order clause.[4]

¶ 19.    We cannot agree.  We are obligated to harmonize the two provisions at issue if they may be harmonized, see Isbrandtsen, 150 Vt. at 580, 556 A.2d at 85, and the manner in which they fit together is abundantly clear: the change-order clause in the subcontractor agreement was the mechanism by which the cost adjustment contemplated in the bid proposal was to be carried out. See John A. Russell Corp., 170 Vt. at 18, 739 A.2d at 1217 (finding contract unambiguous after rejecting construction of paragraph which would conflict with other paragraph and stating "[v]iewing the contract as a whole and construing the provisions in harmony, this is the only reasonable construction"); cf. Madowitz v. The Woods at Killington Owners' Ass'n, 2010 VT 37, ¶ 17, 188 Vt. 197, 6 A.3d 1117 (finding contract ambiguous where "[t]here is simply no harmonious way to read . . . conflicting provisions").  The only mechanism to "add . . . costs"— such as additional costs associated with "additional items" as identified in the bid proposal—was the change-order provision.

¶ 20.    The change-order request clause was implicated because CDI's attempts to free the casing were a "change[] in the work."  CDI's bid proposal delineated a scope of work which included only those items reflected in the flat fee of $266,600.  CDI budgeted four hours of drilling per hole at the contract price, classifying all further drilling necessary to complete the hole as an

---

[4] In support of this contention, CDI points to the trial testimony of ECI's project manager, who stated that drilling in obstructions did not represent a change in the scope of CDI's work. However, the trial court made no finding based on this testimony, in fact concluding that "[d]rilling in obstructions that were not expected based upon the test borings were 'changes in the work.' " "[I]t is for the trial court, not this Court, to weigh the evidence and assess the credibility of witnesses." Estate of George v. Vt. League of Cities & Towns, 2010 VT 1, ¶ 36, 187 Vt. 229, 993 A.2d 367.  Therefore, the project manager's statement has no bearing on our analysis.

10

"additional item." The clear import of the word "additional" is that such obstruction drilling was not a part of the "work" contemplated in the contract, as measured by the contract price. See Additional Work, Black's Law Dictionary (11th ed. 2019) ("Work that results from a change or alteration in plans concerning the work required, usu[ally] under a construction contract; added work necessary to meet the performance goals under a contract."). Moreover, the work done to free the casing—which included drilling a smaller "side hole" and bringing a jack to the site—was substantively different work than the work done to install the pile. The subcontract was clear about the size and number of holes CDI was expected to drill, which did not include the side hole. The fact that a jack was not already on site suggests that it was not otherwise necessary to the work. Therefore, the trial court was correct in concluding that all obstruction drilling which took place after four hours of drilling a given micropile was a "change in the work."

¶ 21. Our conclusion that the subcontract admits of but one interpretation—that the change-order clause was the mechanism by which the additional-items clause was to be effectuated—is buttressed by the two additional contract provisions we identify as material to this dispute. Pursuant to the terms of ECI's contract with the town—as incorporated by reference into the subcontract—in order for ECI to pass costs for differing subsurface conditions on to the town, ECI was required to give notice to the town in writing before further disturbing the conditions or continuing to work. Specifically, if ECI encountered

> subsurface or latent physical conditions . . . at the site differing materially from those specified in the Contract or if unknown physical conditions of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in the work provided for in the Contract, are encountered at the site, the party discovering such conditions shall promptly notify the other party in writing of the specific differing conditions before they are disturbed and before the affected work is performed.

Receipt of such notification would trigger an investigation by the engineer "to determine if the conditions materially differ and will cause an increase or decrease in the cost or time required for

11

the performance of any work under the Contract[;]" but no adjustments were allowed through this provision "for any effects caused on unchanged work." If the written notice is not provided as required, "[n]o Contract adjustment that results in a benefit to the Contractor will be allowed." Similarly,

> [i]n order to bring a claim for additional compensation not clearly covered by the Contract for conditions substantially different than represented by the Contract and not ordered by the Engineer as Extra Work as defined herein, the Contractor must provide written notice . . . to the Engineer before conducting any work or purchasing any materials subject to the claim.

Failure to file such notice of intent was waiver of ECI's "right to bring the Claim under the Contract" with the town.

¶ 22. Significantly, because CDI did not advise ECI that the drill was stuck as a result of what it believed to be an obstruction, ECI was deprived of the opportunity to seek to either mitigate those costs[5] or to pass them on to the town through the latent-conditions provision of the town contract. See Carmichael, 161 Vt. at 209, 635 A.2d at 1217 (recognizing that "bad faith inheres in . . . 'willful failure to mitigate damages.' " (quoting Restatement (Second) of Contracts § 205 cmt. e)). In doing so, CDI parted ways with ECI's justified expectations—expectations which were made particularly clear to CDI by virtue of incorporation of the town contract—undermined its contractual rights, and prevented it from obtaining the full benefit of its bargain.[6] See

---

[5] Indeed, drilling a replacement pile was an option. This would have cost approximately $110,400 less than the amount CDI billed for its nineteen-day effort to finish NC-8.

[6] Contrary to the dissent's characterization, we do not hold that CDI's failure to file a change-order request before drilling in obstructions "plac[ed] ECI in breach of its contract with the town." Post, ¶ 39. Rather, we hold that this failure prevented ECI from obtaining the full benefit of its bargain with CDI, because ECI's ability to seek to pass costs for drilling in obstructions to the town was contingent on CDI providing ECI with notice of these obstructions before the affected work was performed. Moreover, we find the dissent's suggestion that the obstruction in NC-8 did not satisfy the ECI-town contract's definition of a differing subsurface condition because "encountering a subterranean physical obstruction such as a boulder during a drilling project is not unusual" without merit. First, that definition could have been separately satisfied by a material difference from those conditions "specified in the Contract," and second,

12

Restatement (Second) of Contracts § 205 cmt. d (recognizing as one type of bad faith "evasion of the spirit of the bargain" and noting that "bad faith may . . . consist of inaction").

¶ 23.   "Generally, an implied duty of good faith and fair dealing is not understood to interpose new obligations about which the contract is silent, even if inclusion of the obligation is thought to be logical and wise." Downtown Barre Dev., 2004 VT 47, ¶ 18 (quotation omitted). Here, however, the subcontract is not silent: the change-order requirement is not a "new obligation."  The purpose of the subcontract between ECI and CDI was to delineate how CDI would complete one component of a much larger, dynamic project involving multiple variables and decision-makers, as well as an active train schedule.  CDI urges an interpretation of the subcontract which would turn this project-management scheme on its head, allowing a subcontractor—rather than the decision-makers designated in the subcontract and the contract—to unilaterally control the cost and schedule of the project.  Under CDI's view, it could incur costs more than ten times the cost of drilling a new hole and roughly 50% above the contract price without any request for a change order.

¶ 24.   CDI suggests that the additional-items provision would be superfluous if the items listed therein were nonetheless subject to the change-order requirement.  But this argument ignores the reality that the additional-items provision had an important independent effect: it set the price for such additional work, should it be ordered, obviating the need for further discussion or bargaining on this point while the time-sensitive project was underway.  However, it did not vest in CDI the power to determine how to proceed, or give it the unfettered right to expend any amount necessary to free its drill with no notice to ECI of its intent to bill for these efforts.

---

whether a given circumstance is "unusual" is not measured by our understanding of what the process of drilling generally entails.  And in any event, the more important consideration is that because CDI did not request a change order, ECI never had the opportunity to argue that the either prong of the differing-conditions provision of its contract with the town applied.

13

## II. Motions to Reopen the Evidence and for a New Trial

¶ 25. CDI argues that the trial court erred in denying its motions to reopen the evidence and for a new trial. Both rulings are subject to review for abuse of discretion. See In re Bjerke Zoning Permit Denial, 2014 VT 13, ¶ 16, 195 Vt. 586, 93 A.3d 82 ("The trial court has broad discretion to permit further evidence to be offered after the close of evidence in a trial but prior to entry of final judgment."); Brueckner v. Norwich Univ., 169 Vt. 118, 132-33, 730 A.2d 1086, 1097 (1999) ("A decision concerning a motion for new trial pursuant to V.R.C.P. 59(a) lies within the sound discretion of the trial court and will be reversed only where there has been an abuse of discretion.").

¶ 26. We find no abuse of discretion here. The trial court was correct in concluding that the proffered testimony regarding conversations on the job site could have no bearing on the outcome of the case. Under the subcontract, any request for a change order "shall include documentation on the change, add or deduct costs, and possible changes to the schedule." Further, no work could proceed on the change order "until approved in writing by ECI." The evidence proffered by CDI had no bearing on the relevant question, which was not whether ECI had notice that CDI considered the work to be drilling in obstructions, but whether CDI submitted a formal request for a change order including the necessary information. Because this was sufficient ground to deny both motions, we do not reach the merits of the trial court's conclusion that CDI's efforts to locate the foreman did not constitute due diligence.

## III. Attorneys' Fees

¶ 27. CDI implicitly concedes that if the trial court ruled correctly on the breach-of-contract claim, it also correctly found ECI to be the "substantially prevailing party," entitling it to and award of attorney's fees and costs under the Prompt Payment Act. 9 V.S.A. § 4007(c). However, CDI contends that the trial court erred in holding $234,320 to be a reasonable fee amount and urges us to remand on this basis. We review a trial court's ruling on the amount of attorneys'

fees awarded pursuant to the Prompt Payment Act for an abuse of discretion. The Electric Man, Inc. v. Charos, 2006 VT 16, ¶ 6, 179 Vt. 351, 895 A.2d 193.

¶ 28. CDI advances two theories in support of its argument. First, it contends that the fee awarded should be reduced because it is "disproportionate to the value of the case." Second, it argues that, while the trial court found some duplication of attorney time in ECI's bills, further reduction is necessary, because it was not reasonable for two attorneys to do the same work. As the trial court recognized, an award of attorneys' fees in excess of the judgment amount is not per se unreasonable. See Walsh v. Cluba, 2015 VT 2, ¶ 21, 198 Vt. 453, 117 A.3d 798 (affirming fee award four times damage award). "The ultimate question is not whether the attorney's fee award is proportional to the damages, but rather whether the fee award is reasonable given the demands of the case." Id. (quotation omitted). The trial court acted within its discretion in determining that the demands of this case rendered the fee award reasonable.

¶ 29. We reach the same conclusion with respect to the argument that the award was excessive because of unreasonable duplication of the efforts of ECI's two attorneys. "While a court can generally reduce the number of hours charged by attorneys due to duplication, there are situations in which a certain level of duplication between attorneys is reasonable." Spooner v. Town of Topsham, 2010 VT 71, ¶ 18, 188 Vt. 293, 9 A.3d 672 (citations omitted). Such reduction is called for "only if the attorneys are unreasonably doing the same work. An award for time spent by two or more attorneys is proper as long as it reflects the distinct contribution of each lawyer to the case and the customary practice of multiple-lawyer litigation." Id. (quoting Afro-American Patrolmen's League v. City of Atlanta, 817 F.2d 719, 726 (11th Cir. 1987)). The trial court found some unreasonable duplication of efforts and accordingly reduced the award by that amount. However, it concluded "that the specialized legal skills of both defense counsel, who specialize in construction law, were of importance in this case." It also recognized that, in "paper-intensive

15

case[s]" like this one, "with many documents to be managed[,] [t]wo lawyers . . . are always better than one at trial." This conclusion, too, fell well within the court's discretion.

¶ 30. Because we affirm the trial court's decision on the merits of CDI's breach-of-contract claim, we do not reach the issue raised in ECI's cross-appeal.

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 31. **CARROLL, J., dissenting.** In my view, the contract between the parties in this case clearly entitled CDI to recover the costs it incurred in drilling through the obstruction it encountered in micropile NC-8. The contract did not require CDI to seek approval from ECI before doing the work because drilling through an obstruction was not a "change in work." Accordingly, I would reverse the decision below and remand for the trial court to enter judgment in favor of CDI.

¶ 32. It is a bedrock principle that "we interpret contracts to give effect to the parties' intent, which we presume is reflected in the contract's language when that language is clear." In re Adelphia Bus. Sols. of Vt., Inc., 2004 VT 82, ¶ 7, 177 Vt. 136, 861 A.2d 1078. "When the plain language of the writing is unambiguous, we take the words to represent the parties' intent, and the plain meaning of the language governs our interpretation of the contract." Southwick v. City of Rutland, 2011 VT 105, ¶ 5, 190 Vt. 324, 30 A.3d 1298 (citation omitted). "[T]he fact that a dispute has arisen as to proper interpretation does not automatically render the language ambiguous." Isbrandtsen v. N. Branch Corp., 150 Vt. 575, 581, 556 A.2d 81, 85 (1988). Similarly, an unwise or risky business decision does not necessarily make a commercial contract provision ambiguous or unenforceable. See Purcell Tire & Rubber Co. v. Exec. Beechcraft, Inc., 59 S.W.3d 505, 508

(Mo. 2001) ("Sophisticated parties have freedom of contract—even to make a bad bargain, or to relinquish fundamental rights.")

¶ 33.  The contract between the parties consisted of CDI's bid proposal and the subcontractor agreement prepared by ECI.  The subcontractor agreement provided that "CDI's proposal dated January 11, 2013 is included in and forms an integral part of this subcontract and takes precedence over any other terms and conditions of the subcontract."  The bid proposal set a flat price of $266,000 for CDI's work on the project, which included mobilizing for the project, drilling one test pile load, and drilling micropiles.  It contained a provision permitting CDI to upwardly adjust the price by specified amounts for three additional items: excess grout, standby costs for certain work stoppages, and drilling in obstructions.  The additional-items provision defined obstructions to include steel, timbers, old foundations, and boulders that required more than four hours to complete drilling the hole.  The additional-items provision stated that "[t]he price quoted shall be adjusted during the course of the work by . . . payment of $920.00 per rig hour" for drilling in obstructions. (Emphasis added.)  It did not state that CDI was required to seek approval from ECI before drilling in obstructions at the additional rate.

¶ 34.  The additional-items provision is unambiguous: it allowed CDI to unilaterally adjust the contract price upward for the additional time required to drill through any obstructions encountered in drilling the micropiles.  The parties—both sophisticated business entities—clearly understood that obstructions could be encountered during the drilling project and made an agreement to deal with that variable.  No "mechanism," other than the conditions specified in the provision, was required to trigger the additional rates set forth in the additional-items provision. Cf. ante, ¶ 18.

¶ 35.  The trial court found that CDI was drilling in an obstruction within the meaning of the additional-items provision when the casing became stuck in micropile NC-8.  Its finding is supported by the evidence.  The court therefore should have enforced the plain language of the

17

additional-items provision and awarded CDI the additional costs it incurred to complete drilling the hole. See Downtown Barre Dev. v. C & S Wholesale Grocers, Inc., 2004 VT 47, ¶ 8, 177 Vt. 70, 857 A.2d 263 (explaining that unambiguous contract language will be enforced according to its terms).

¶ 36. Instead of enforcing the provision, however, the trial court held that "common sense" implied a condition that CDI seek a change order before proceeding. It reasoned that incurring additional costs to drill through the obstruction constituted a "change in work" for which prior approval by ECI was required. This was error. The additional-items provision contained no such notice requirement. Drilling through obstructions did not constitute a change in work because the provision expressly anticipated that such work could be necessary during the course of the project. Unless the trial court found the provision to be ambiguous—which it did not—it was required to enforce the contract according to its terms. "Though we consider an agreement as a whole when examining individual provisions, we will not insert vaguely implied conditions, particularly when those conditions are inconsistent with the express language of the agreement." Madowitz v. Woods at Killington Owners' Ass'n, 2010 VT 37, ¶ 12, 188 Vt. 197, 6 A.3d 1117 (quotation and alterations omitted). It was improper for the trial court to imply a condition requiring CDI to obtain a change order for drilling in obstructions when such work was expressly anticipated as a potential part of the ordinary process of drilling micropiles.

¶ 37. Furthermore, the court's interpretation is inconsistent with its decision to award CDI the costs of excess grout. CDI's claim for the excess grout was based on the same additional-items provision as its claim for the additional costs of drilling through the obstruction in micropile NC-8. CDI did not request a change order for either of these items. The trial court did not explain why CDI could charge for the excess grout but not for drilling through the obstruction.

¶ 38. The majority adopts the trial court's faulty reasoning and further asserts that CDI changed the work by bringing in a jackhammer and changing its method of drilling to free the

18

casing from the obstruction in micropile NC-8. <u>Ante</u>, ¶ 20. But the contract is not specific as to the methods or equipment necessary to conduct the drilling, especially when an obstruction must be dealt with. Indeed, the project specifications incorporated into the contract state that "the micropile Contractor shall select the drilling method." The majority's interpretation is an unrealistic stretching of the contract terms.

¶ 39. The majority goes on to conclude that if CDI was not required to notify ECI prior to drilling through the obstruction, it would put ECI in the position of breaching its contract with the town, which was incorporated by reference into the subcontract. <u>Ante</u>, ¶¶ 21-22. This argument was not briefed by the parties or addressed by the trial court, and it is not supported by the language of ECI's contract with the town. The provision relied upon by the majority requires ECI to notify the town only of excess billing expected to arise from an encounter with "subsurface or latent physical conditions . . . at the site differing materially from those specified in the Contract or . . . unknown physical conditions of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in the work provided for in the Contract." ECI does not argue, and the trial court did not find, that the subsurface conditions encountered by CDI differed materially from those specified in ECI's contract with the town. And encountering a subterranean physical obstruction such as a boulder during a drilling project is not unusual. To the contrary: such conditions are inherent in drilling, which was the very reason there was a separate provision in the subcontract which dealt with drilling in obstructions. ECI would not have been required to get town approval to drill through the obstruction. Accordingly, CDI's actions did not violate the implied covenant of good faith and fair dealing by placing ECI in breach of its contract with the town, as the majority asserts.

¶ 40. The majority faults CDI for unilaterally deciding to drill through the obstruction without notifying ECI first. Unfortunately, ECI allowed CDI to do just that by agreeing to the additional-items provision in the bid proposal. "[N]o court may rewrite unambiguous contractual

19

terms to grant one party a better bargain than the one it made." <u>Downtown Barre Dev.</u>, 2004 VT 47, ¶ 14 (quotation omitted).  The decisions of the majority and the trial court disregard the plain language of the parties' freely bargained-for contract.  I therefore respectfully dissent.

¶ 41.    I am authorized to state that Justice Robinson joins this dissent.

_____

Associate Justice